**STOVALL v. THOMAS LUMBER CO. et al.**

**No. 5765.**

Court of Appeal of Louisiana. Second Circuit.

March 8, 1939.

Rehearing Denied April 28, 1939.

Julius T. Long, of Shreveport, for appellant.

Harry Fuller, of Winnfield, for appellees.

TALIAFERRO, Judge.

Plaintiff suffered an accident on February 25, 1937, wherein his right leg was broken. On the theory that he was at the time an employee of the Thomas Lumber Company, a copartnership, and was injured while performing the duties for which he was employed, he instituted this suit against said copartnership and its individual members, K. A. and L. R. Thomas, to recover compensation as in case of permanent total disability.

Defendants' answer is in effect a general denial with amplifying allegations that when injured, plaintiff was either working for himself or for someone having no connection with defendants or either of them.

Plaintiff's demands were rejected and his suit dismissed. This appeal is prosecuted by him.

Appellees move to dismiss the appeal on the alleged ground that it was not asked for by plaintiff in open court nor prayed for by petition. The record facts pertinent to the issue raised by the motion are these:

Judgment was rendered and signed on January 6, 1938. The minute entry of that date states that at the request of counsel for plaintiff, appeals devolutive and suspensive were granted to this court. Bond for the former was fixed at $300 and for the latter at $500. This order was not availed of. The minutes further show that on May 7th defendants' counsel appeared in open court at the request of the judge thereof, and that then and there "at the request of attorney for plaintiff, a devolutive appeal is ordered granted to the plaintiff" to this court, upon the giving of bond in the sum of $75. Under this order the present appeal was perfected. Defendants' counsel, the minutes show, "while taking cognizance of the order, * * * objects thereto and reserves all rights defendants have or may have to move for the dismissal of the appeal".

It is said in the motion that plaintiff's counsel was not in court when the last order of appeal was entered and therefore did not "request" that the court make the order. Evidently a request of some character from counsel to the court was made or else said second order of appeal would not have been entered. Regardless of whatever merit, if any, the motion to dismiss might have had if timely filed, clearly it comes too late. Its merits cannot be considered by us.

As a rule, motions to dismiss appeals must be filed in the appellate court within three days after the return day. Code of Practice, Article 886. There are, of course, exceptions to this general rule. The facts of the present motion do not make of it an exception to the rule. The return day under the last order of appeal was May 25th. The record was filed here on May 23d. The motion to dismiss the appeal was not filed until the following December 1st. See Tyler v. Phillips et al., 18 La.App. 654, 139 So. 35; Id., La.App.,

150 So. 681; Richard v. Horecky, 13 La. App. 507, 128 So. 177.

In Scheen v. Hain et al., 141 La. 606, 75 So. 427, it was held: "A motion to dismiss an appeal on the ground that there was no motion or petition is too late, when it is filed more than three days after the transcript was filed." See also D'Angelo v. Nicolosi et al., 188 La. 326, 177 So. 64; and authorities therein cited.

The motion is denied.

In the lower court, the case was almost entirely fought out on the issue of employment. That issue alone has been argued and submitted here.

The testimonial proof consists of over 400 pages. In addition to this, considerable documentary evidence was introduced by both sides. The record teems with hearsay testimony, some of which was introduced without objection, while other portions were admitted by the trial judge, subject to objection, out of an abundance of caution so that it would be before us on appeal. We are favored by the lower court with lengthy written reasons for judgment.

The defendant company is engaged in the manufacture of lumber. It owns and operates a small sawmill near the town of Winnfield, Louisiana, which it had been running for some two years when plaintiff was injured. In connection with the sawmill, it operates dry kilns and a planer mill. K. A. and L. R. Thomas are the sole members of the partnership. This company also owned two portable sawmills, one of which was located near Wyatt, in Jackson Parish, and the other near Atlanta, in Winn Parish. The mill at or near Wyatt was idle for the lack of logs. According to the record, it was leased to the Tucker-Walker Lumber Company, a co-partnership composed of M. A. Walker, of Pineville, Louisiana, and R. T. Tucker, of Winnfield, on February 1st for an annual rental of $250. The lease contract is in writing. Tucker was at the time the saw and planing mill superintendent of defendant, the Thomas Lumber Company, and had been so employed for over two years. Under said partnership name, he and Walker had previously operated a sawmill in another parish. They moved the leased mill from Wyatt at their expense and relocated it at Sikes, in Winn Parish, twenty miles north of Winnfield. Logs were needed. These began to come in and on March 5th it had its first pay day.

Plaintiff lives about fifteen miles north of Winnfield. He has had some experience in operating small sawmills and in buying timber and handling saw logs. In the latter part of January, 1937, he purchased the commercial timber on a 40-acre tract owned by a sister in Winn Parish, and began to cut the trees into saw logs and to haul them to a sawmill company, a few miles from his home. After delivering a small quantity to this mill, he was approached by defendant K. A. Thomas, with the view of acquiring his rights to this timber and they very soon reached an agreement. This was about February 1st. Thomas promised to pay him $2 per thousand feet more than he was due his sister. Thereafter, the Thomas Lumber Company cut and removed the remainder of the timber and paid to plaintiff the agreed stumpage price on regular pay days, the 5th and 20th of each month.

Plaintiff testified that a day or two after he and Thomas closed said trade, he contacted Thomas while he was doing some work on a road over which the logs were to be hauled; that Thomas was complaining about the weather and the road, and thereupon, he, plaintiff, asked him why he did not "get somebody to get out and get you some timber that you can get"; that Thomas asked him if he could get any such timber, to which he replied "yes"; that Thomas said nothing further on the subject at that time, but on the following day he came to where plaintiff was and brought Tucker with him. After being introduced, Tucker inquired if he could get a cruise of the timber mentioned to Thomas the previous day. Plaintiff declined to reveal the location or owner of the timber. He says that Tucker and Turner offered to pay him a commission if they could purchase the timber, but that he declined the proposition. They parted and he saw neither again until the next pay day, the 5th.

Plaintiff further testified that on February 5th, while waiting for a settlement for part of the timber sold defendant, L. R. Thomas asked him when he was going to "show them that timber", to which he replied "when you make a deal with me". He says that Thomas asked him to return the next day to close the discussed deal, and that he did so, but Thomas referred him to Tucker with the advice that Tucker was their log man and that he would back up any agreement made with him; that

he immediately contacted Tucker and he agreed to put "me on the regular monthly payroll". He admits that there was then no definite understanding as to his salary. He was to begin work the following Monday. On the following Friday, he testified, Tucker fixed his salary at $150 per month, plus gasoline and motor oil for his car, and that he immediately went about locating and cruising timber in the northern part of Winn Parish.

After contacting several owners of small tracts of timber, plaintiff learned that a Mr. Guess, residing at Jonesboro, in Jackson Parish, was about to dispose of 80 acres of desirable timber and he phoned this information to Mr. Tucker. Tucker could not join him on a trip to see Guess that day, but said he would do so the following day (Tuesday). Tucker, accompanied by Mr. Walker, contacted plaintiff the next day and he got in their car and the party drove about the country looking at various small tracts of timber. That was the first time Walker entered the picture, so far as plaintiff is concerned. They drove to Jonesboro that afternoon to see Mr. Guess. After considerable negotiations with him, their efforts came to naught. The preponderance of the testimony sustains defendants' contention that if this timber had been purchased within a certain price that plaintiff would have to be paid, as was agreed, a commission of $100.

After a second trip to see Mr. Guess, plaintiff testified that Tucker drove him out to a little mill where 10-foot logs were being sawed. From that time until he was injured plaintiff alone or with Tucker or Walker, actively scouted the country for timber with the primary purpose of supplying the mill afterward located at Sikes. He says that Tucker told him that he wanted him to see to it that there were 200,000 feet of 10-foot logs at this mill when it was ready to begin sawing. The mill was erected on a site to which plaintiff had directed Tucker.

Plaintiff was injured while attempting to show an inexperienced man, whom he had hired, the proper method of engaging logs with tongs preliminary to bunching them. The logs were on land belonging to one Bratton. Plaintiff and Bratton entered into an agreement whereby Bratton was to be paid $4 per thousand feet for his timber and 75 cents additional per thousand for cutting the trees into 10-foot logs. Plaintiff engaged one Matthews to truck the logs to the mill at Sikes for $3.25 per thousand. He also hired a man to "bunch" the logs, by means of a mule furnished by plaintiff, so that they could conveniently be loaded on trucks. He was to be paid $1 per day. Plaintiff told Matthews that the logs would be hauled to "the Sikes mill of the Thomas Lumber Company". He told Bratton that the timber was being purchased for the Thomas Lumber Company at Sikes and that that company would pay him for stumpage on the 5th and 20th of each month.

Only one batch of these logs had been hauled away when plaintiff was injured. The truck became stuck in the soft earth 100 yards from the Sikes mill and the logs were there unloaded. They never reached the mill.

It would have cost around $8.25 to deliver these logs to the Sikes mill. They were worth there, dependent upon grade, plaintiff says, from $9.50 to $10 per thousand. Defendants query: Who was to get the difference between the delivered price and the cost of delivery? Plaintiff had been told that the Sikes mill would pay $10 per thousand for logs delivered there. He did not inform anyone connected with either mill that he had purchased any timber from Bratton. While in the clinic, after being injured, he told Mr. Boyett, the man he had hired to bunch the logs, and Matthews, that he was out of the Bratton timber and that they (Boyett and Matthews) could easily make some money by delivering it to the mill; that he had bought it right and wished to have it hauled to the mill; that if the Sikes mill would not take the logs, either the Thomas mill or another one at Winnfield would do so. They did not pursue the matter further. Bratton resold the timber to another party. From the facts pertinent to the Bratton timber sale, etc., related above, defendants contend that plaintiff was acting for himself therein and not for the Thomas Lumber Company; that he was simply handling the logs in such manner as to yield to himself a profit, as was being done with his sister's timber before he sold it to defendant.

L. R. Thomas positively denies that he employed plaintiff in any capacity for his company or that he referred him to Tucker for the purpose of closing a contract of employment. Tucker is as equally positive that he did not at any time employ plaintiff for any purpose; never told him that he would

be placed on the payroll at $150 per month, or for any other salary. He admits that plaintiff asked for employment several times and evinced an aversion to buying logs and timber on a commission basis. Tucker was. without the power to employ anyone in the capacity plaintiff desired to work.

The Thomases testified that their company did not need the regular services of a cruiser and log man to keep the mill supplied with logs; that they were well able to personally look after such matters without entailing an additional monthly expense of nearly $200. (Their mill is of limited capacity and not of large financial strength). It had been running for over two years without entailing such expense. They further testified that the mill is largely supplied with the logs purchased from various people without contract, and delivered on the skidways.

It seems very clear to us that if plaintiff was hired by Tucker, he acted for and on behalf of the Tucker-Walker Lumber Company, of which he was a member. If L. R. Thomas referred plaintiff to Tucker to discuss terms of employment, it was because of Tucker's connection with that company.

Plaintiff's energetic counsel assails in no uncertain manner the contention of defendants that the Tucker-Walker Lumber Company is a distinct legal entity from the Thomas Lumber Company, and that as such it leased the mill afterwards located at Sikes and operated same for its own separate account. He insinuates that the purported lease of the mill equipment is not genuine, but originated from necessity, that is, from a determination to defeat plaintiff's compensation claim without regard to means. The testimony referred to herein clearly disproves these charges.

The Thomas Lumber Company, in addition to manufacturing logs into lumber, buys quite a large amount of green and dry rough lumber from smaller mills without planer equipment, etc. It is a common practice with defendant and other sawmills that do this to advance cash to these mills for operating expenses and to acquire timber with the understanding that such advances are to be repaid in lumber at current market prices. In keeping with this practice, defendant did advance cash to the Tucker-Walker Lumber Company to enable it to meet its first payroll, and from time to time thereafter repeated advances to it as its needs warranted. Approximately 75% of its output was sold to defendant. The other 25% was sold to individuals and other sawmill companies. Cancelled checks of defendant in favor of the Tucker-Walker Lumber Company, over a period of a few months, aggregating nearly $15,000, were introduced in evidence. These, it is testified, were given to pay for lumber delivered.

It is shown that the Tucker-Walker Lumber Company carried active bank accounts in its own name; had its own letter and bill heads; received and answered correspondence addressed to it; and in all other respects conducted its business independent of and without reference to defendant, save in the respects above mentioned. Walker was in active charge of its affairs, while Tucker, retaining his position with defendant, looked after most of its clerical business.

Obvious reasons may be cited to justify defendant in leasing its mill to the Tucker-Walker Lumber Company and for rendering financial aid to it thereafter. The mill was idle for lack of logs. Tucker's association with and interest in both companies probably had some influence, but the certainty of acquiring the major part of the mill's output was evidently the controlling factor. This mill could be moved from place to place with small expense. It could be supplied with logs inconvenient or too expensive to be hauled to the Winnfield mill. In this way it could serve as a feeder of lumber to that mill.

It is quite certain that from about the time the mill was located at Sikes, plaintiff industriously busied himself with contacting owners of small tracts of pine within convenient reach of the mill. He was usually accompanied by Tucker and Walker or one of them. To some owners, Tucker referred to plaintiff as working for "us". It is Tucker's and Walker's contention that plaintiff was thus referred to because he was endeavoring to acquire timber on contract to be delivered to their mill at a profit to himself, as he purposed to do with the Bratton timber, above discussed. Touching plaintiff's status in regard to the Bratton timber, the lower court said:

"* * * The patch of timber that he purchased from Bratton was close to the Sikes mill. He had same bought and cut for $4.25 and it was to be delivered at $3.-25, leaving a margin of $2.50 a thousand, and he used his own mule, which he carried about a distance of seven miles for the

purpose of bunching and loading these logs onto this truck, and had hired a man to assist in this. These incidents imply that it is a fact that he was cutting this timber for himself, hoping to make a margin of profit of $2.00 for his profits and for loading same. In the affairs of men, it would be exceedingly strange for a man to be employed at a salary of $150.00 a month as a timber estimater and woods foreman to bring one of his own mules a distance of six or seven miles for the purpose of bunching and loading logs for the company he was working for without saying anything to them about it, when there were men in the community in which the timber was located, who owned teams and which would be sufficient to bunch and load logs."

There are some errors in the figures appearing in this excerpt, as compared with the testimony, but aside from these, we are in accord with the conclusions expressed. The facts certainly disclose that in having the Bratton timber cut and hauled, plaintiff was acting for his own account and independently. This goes far toward negativing the contention that he expected to be paid a salary by defendant. Surely, if so salaried, he could not expect his employer to allow him to acquire and sell to it, or to anyone else, logs at a profit.

 In June, 1937, plaintiff engaged an attorney of Winnfield to make demands for compensation payments from defendants, and in default of such payments, to file suit. This attorney ·promptly made written demand in keeping with plaintiff's wishes. In the letter containing the demand, it is stated that plaintiff informed him (the attorney) that no definite amount of salary had been promised him, but that the services he had rendered and was expected to render, under the terms of his employment, were well worth $40 per week. Thereafter, this attorney informed plaintiff that he could not handle the case for him. He thereupon engaged his present counsel

to prosecute his claim. He wrote a lengthy letter to the present counsel giving the entire history and facts of the case as a means of providing intelligent information upon which to draft the petition and prepare for trial. In this letter plaintiff stated that he had been promised a salary of $150 per month, plus gas and oil for his car. To offset the probative worth of the first counsel's letter to defendants, plaintiff's counsel offered in evidence the entire letter written to him by plaintiff. The offering was objected to on several grounds, mainly, that it was wholly self-serving. The objection was sustained. This ruling is vigorously assailed here. The letter is before us as a part of a formal bill of exception. The objection to its admissibility was properly sustained. It is simply the ex parte statement of plaintiff. His own testimony was adduced and is in the record. Statements by him, orally or written, out of court, which support his testimony, are not admissible. They are banned under the rule applying to self-serving declarations.

Plaintiff's counsel, in lengthy brief, has copiously discussed all of the issues of the case, and elaborated upon several isolated facts deemed favorable to plaintiff's contentions, to which we have not made specific reference. These facts, singly or together, of course, cannot possibly have the effect of altering the conclusions we have reached on the primary issue of the case. Therefore, discussion of them could serve but one purpose and that would be to unnecessarily prolong this opinion, already quite lengthy.

 The lower court definitely reached the conclusion that plaintiff had not been employed by the Thomas Lumber Company. It was not required that it go further. We have reached the same conclusion.

For the reasons herein assigned, the judgment of the lower court appealed from is affirmed, with costs.