**OZBOLT v. WEBER–KING MFG. CO. et al.**

**No. 2092.**

Court of Appeal of Louisiana. First Circuit.

Jan. 30, 1940.

Cline, Thompson, Lawes & Cavanaugh, of Lake Charles, for appellants.

Kay & Kay, of DeRidder, for appellee.

DORE, Judge.

This is an appeal, by the defendant Weber-King Manufacturing Company and its insurance carrier, from a judgment granting compensation at the rate of $7.15 per week for a period of 300 weeks on behalf of the plaintiff and her two minor children, arising from the death of Jack Ozbolt, the husband of the plaintiff and the father of the two minor children.

It appears that Jack Ozbolt was engaged in the firing of a boiler or boilers for the defendant company on January 20, 1939, when, at just about 4 o'clock P. M. of that day, he fell dead. It is agreed that if compensation is due, it should be in the amount granted in the judgment below, and the only question presented to us in this case is whether or not the death of the decedent was an accident within the meaning of the Workmen's Compensation Act of this State (Act No. 20 of 1914).

The deceased was, and had been for a year or more, affected with heart trouble, hardening of the arteries and high blood pressure. The employer's physician had examined the deceased and was familiar with his condition. The deceased appears to have worked regularly up to the day of his death. He went to work on January 20, 1939, at about 12 o'clock noon and was on duty from that time until his death a few minutes after 4 o'clock P. M. There is some discrepancy in the testimony as to just how much work the deceased did from the time he came on duty until about 3:30 o'clock of that afternoon. One witness testifies that he shoveled fuel into the furnaces of the boilers at regular intervals of twenty or thirty minutes and rested and cooled off, as was usual with the firemen, between these fueling periods. There is other testimony to the effect that the boilers were fed, up until the planer stopped at 4 o'clock P. M., by a self-feeding system of blow-pipes which conveyed the shavings into the furnaces, and, during this period, the only duties a fireman had was to watch the water gauge, unchoke the fuel pipes and

keep the fuel properly supplied by shoveling in the shavings whenever the pipes were choked.

There is testimony to the effect that the deceased stated to a fellow fireman, only a short time before his death, that he was tired; that he had been working hard. It is shown that the deceased left the boiler room around 3:30 that afternoon and went to the company office for some money and was gone twenty or thirty minutes. Shortly after he returned, the planer mill closed down and it was necessary for him and his fellow fireman to feed the furnaces with shavings and other fuel by means of shovels with which they took the fuel from nearby bins and threw it into the open doors of the hot furnaces.

When these furnace doors were opened, there was an intense heat which emanated from them, and, of course, reflected a great deal of heat into the face and on the person of the fireman who was required to stand near these open doors as he shoveled in the fuel. It took ten or fifteen minutes of this hot and exhausting work to fill the boilers, after which the firemen would retire to a bench through an opening in the eastern part of the boilerroom and rest and cool off for twenty or thirty minutes, when it would be necessary for them to again replenish the furnace with fuel.

Regardless of just how much and how strenuous work the deceased had done up to 4 o'clock (and the fact that he complained of being tired indicates that he had exerted himself in some way, either in unchoking the fuel pipe or by shoveling in shavings), it remains a fact that the deceased had been engaged in the hot and exhausting task of shoveling fuel into the furnace from three to five minutes before he fell out and died almost immediately. It is shown that his muscles twitched and his body was drawn, indicating some sudden and violent internal disturbance. It appears from the evidence (and, in fact, it is too obvious to require proof) that the most severe heat comes from the furnace when the doors are first opened and the pent up heat is released and almost burns the face of one standing near the doors. Of course, as the fires are partly smothered by the fresh fuel, the heat will diminish.

The company doctor saw the deceased a short time after he died. This doctor attributed the death to an acute dilation of the heart. He admitted that extreme heat and over-exertion would aggravate a weak heart and high blood pressure. Another doctor testified that a person suffering from a weak heart, high blood pressure and hardening of the arteries, might suffer an acute dilation of the heart or sustain a rupture of a cerebral vessel, and that over-exertion and over-heating could be contributing factors in bringing about sudden death under such conditions.

The fact that the job which the deceased was required to perform was one calculated to over-heating and exhaustion is shown by the fact that these firemen had to take a period off after these periodical firings in order to cool off and rest. To say that the deceased might have died suddenly at home or in any other place is merely entering the field of speculation.

The facts and circumstances surrounding the sudden death of deceased convince us that it was hastened by the over-heating and over-exertion arising directly from performing duties in connection with his employment, and, following the decisions in the cases of Brister v. Miller, La.App., 178 So. 284; Wright v. Louisiana Ice & Utilities Co., 19 La.App. 173; 138 So. 450; Becton v. Deas Paving Company, Inc., 3 La.App. 683; and Johnson v. Zurich General Accident & Liability Insurance Co., La.App.; 161 So. 667, we are of the opinion that the lower court was correct in finding liability herein under the Compensation Act.

For these reasons, the judgment is affirmed.