This is a suit for workmen's compensation. We find the facts of the case to be as follows:
Plaintiff is a thirty year old colored laborer. During the month of July 1942, he was employed by Delta Shipbuilding Company, Inc., at a wage equaling $32 per week. On February 8, 1943, while he was engaged in the performance of his duties of cleaning up debris on the deck of a ship under construction, he was struck on the head, shoulders and back by a large steel or iron valve which was being handled by plumbers working above him and which fell from a height of some eight or ten feet onto his body, rendering him unconscious. He was carried about three blocks to a first aid station, which had been provided by his employer, where he received treatment and thereafter was taken to the Illinois-Central Hospital where he was treated for a period of a week by physicians of his employer and its insurer. Upon his discharge from the hospital, he was sent home where he received further treatment until March 30, 1943, when his employer's physicians advised him that he was fully recovered and could go back to work.
Accordingly, plaintiff resumed his duties with the company on March 30th but, shortly thereafter, complained of severe pains in his chest which made it impossible for him to continue his work. After making these complaints to a Dr. Rein (who was in charge of the first aid station provided by the shipbuilding company), he was again referred to Dr. Joseph Scott, Jr., physician for the company. Dr. Scott, believing that plaintiff was a malingerer, declined to give him further treatment. Plaintiff thereupon discontinued working and went to the clinic at Touro Infirmary where he was administered digitalis. Thereafter, he employed Dr. Sydney Jacobs, an internist, who diagnosed plaintiff's trouble to be hypertensive heart failure and prescribed that he remain in bed for a month. Subsequently, on July 14, 1943, plaintiff was admitted to Charity Hospital of Louisiana at New Orleans where his ailment was diagnosed as chronic glomerular nephritis and cardiac decompensation. He remained at Charity Hospital under treatment for a period of twenty-nine days.
Claiming that he is totally permanently disabled to do work of a reasonable character — in that he is suffering from hypertensive cardiac disease which has been greatly aggravated and accelerated as a result of the injuries sustained by him on February 8, 1943, plaintiff brought the instant suit against his former employer, Delta Shipbuilding Company, Inc., and its compensation insurance carrier, Fidelity and Casualty Company of New York, to recover workmen's *Page 498 
compensation at the rate of $20 per week for 400 weeks, plus $250 medical expenses, and subject to a credit of $136.67 (compensation heretofore paid by the defendants).
The defense to the action is that the heart ailment from which plaintiff now suffers is not in anywise attributable to the injuries sustained by him on February 8, 1943; that said injuries consisted of contusions and bruises to plaintiff's shoulders, back and head; that he received immediate and thorough medical and hospital treatment therefor and that he has fully recovered therefrom.
After a trial on the foregoing issue in the district court, there was judgment in favor of defendants. Plaintiff has appealed.
Defendants concede that plaintiff is and has been suffering from cardiac disease and that his disability is such as to prevent him from doing manual labor. In these circumstances, the sole question for decision is whether plaintiff's present disability is attributable to the injuries he received on February 8, 1943, when he was struck by the iron valve. And since the medical evidence in the case indicates that it is likely that plaintiff was afflicted with a dormant diseased condition of his heart before the occurrence of the accident (although it does not appear that he actually suffered an attack prior to his injury), the question is narrowed down to an investigation of whether this pre-existing dormant heart condition was aggravated or accelerated by the accident. The answer to the problem must be found in the medical testimony adduced, giving due regard, of course, to the sequence of events which culminated in the appearance of the heart trouble of which plaintiff complains.
Plaintiff's main expert witness is Dr. Sydney Jacobs who first discovered that plaintiff was suffering from heart trouble and thereafter administered treatment for his ailment. Dr. Jacobs testified at length at the trial below. It was primarily his opinion that the blow which plaintiff sustained is the direct, immediate and proximate cause of his present condition. He expressed the view that a violent blow to the head, shoulders and back, such as that sustained by plaintiff, can cause cardiac disease even though the heart be in sound condition prior thereto. However, when confronted on cross-examination with a letter which he had written to one of the attorneys for plaintiff on December 7, 1943, and in which he had expressed the opinion that plaintiff had in all probability been suffering from hypertension and possibly cardiac disease prior to the accident, Dr. Jacobs admitted that it was entirely possible that plaintiff had a dormant diseased condition of the heart and that his diagnosis of pre-existing hypertension was based on the fact that plaintiff's heart was enlarged. The witness explained that he is unable to definitely assert whether this hypertensive cardiac condition antedated the accident or not but that, if it did, it is certain that the blow received by plaintiff accelerated or aggravated the disease and precipitated its activity.
Plaintiff also produced Dr. William A. Sodeman, a specialist in vario-vascular diseases, who examined plaintiff on December 15, 1944. Dr. Sodeman stated that, in order to cause traumatic heart disease, it is necessary that the blow received by the sufferer be directed in the vicinity of the heart and that, inasmuch as he has no knowledge concerning the nature of the blow received by plaintiff, he is unable to say positively whether or not the blow did cause the heart injury. He did say, however, that a blow involving the region of the heart could very well produce heart disease or aggravate a pre-existing diseased condition of the organ.
To combat the positive evidence given by Dr. Jacobs, defendants submitted the depositions of Drs. Robert Bernhard and Willard Wirth who specialize in internal medicine and cardiology. Dr. Bernhard stated, in substance, that he examined plaintiff on June 2, 1943, at the request of the defendant insurance company; that plaintiff told him that he was struck on the back or shoulder by an iron valve on February 8, 1943; that he was treated by Dr. Scott for seven weeks for this injury and was then discharged; that he went back to work perfectly well and after three weeks suddenly experienced a severe pain across his chest and that the pain was so intense that he was forced to stop working. The doctor further said that, in view of the history given to him by plaintiff, he is of the opinion that the heart condition from which plaintiff now suffers has nothing to do with the original traumatic injury, "from which he told me he had completely recovered". The witness further stated that it is his opinion that, since the heart is protected from injury by a pericardial *Page 499 
sac, it is impossible for a blow to cause traumatic myocarditis unless the chest wall is perforated.
The testimony of Dr. Willard Wirth is not as strongly favorable to defendants as that of Dr. Bernhard — for, while the doctor expresses the view that the heart condition now suffered by plaintiff has no causal connection with the accident, he concedes under cross-examination that it is entirely possible that a blow upon the head and back administered to a person suffering with heart disease could increase or accelerate the activity of the disease. He stated as follows:
"Q. In your opinion, could the blow from that heavy instrument that fell on him, on his back and head, have any effect on his heart? A. I think that it is possible that a blow could have some effect on a person with heart disease.
"Q. You mean in the way of increasing its intensity, or something of that kind, or accelerating it? A. Yes; it would have some deleterious effect on the progress of the heart condition."
Defendants further produced reports given by Drs. Joseph Scott, Jr., and G.C. Battalora, an orthopedist, who examined and treated plaintiff during and after his confinement in the Illinois-Central Hospital immediately following the accident. These reports, however, are of no value in solving the problem here presented for the reason that neither of the aforementioned doctors had occasion to examine plaintiff's heart and apparently did not consider that he might have been suffering from heart disease. In fact, they urged plaintiff's return to work on the ground that he had fully recovered and expressed the view that he was a malingerer.
Thus, the question boils down as to whether the opinion voiced by Dr. Jacobs preponderates over the negative views of Drs. Bernhard and Wirth, as we do not regard that the testimony of Dr. Sodeman is of advantage to either litigant.
Counsel for defendants vigorously attack the evidence of Dr. Jacobs, proclaiming that it is not only overcome by the opinions of Drs. Bernhard and Wirth, but that, in fine, the most that can be said of his view is that he follows the easy path of "Post hoc, ergo propter hoc" — that is, "After the accident, therefore caused by the accident".
We do not agree with counsel. Dr. Jacobs' evidence impresses us as being most intelligent; his views are logical and his conclusions are founded upon common sense. It will not do to say that his deductions are predicated solely upon the proverb "Post hoc, ergo propter hoc", for his evidence clearly demonstrates otherwise. Of course, the nature of the original injury and the sequence of events following it are most significant to us in our endeavors to decide whether plaintiff's present disability is attributable to, or has been aggravated by, the accident. Here, the evidence discloses an apparently healthy negro, thirty years of age, doing laborious work successfully. He receives a violent blow to his head and back (and maybe, for aught we know, near the region of his heart), is hospitalized, receives treatment for contusions and bruises and, at the end of six weeks, is discharged as cured and told to resume work. He does so and, within three weeks of the resumption of his duties, he is seized with terrific pains in the region of his heart and, after futile attempts to obtain further treatment from his employer, he goes to an internist who diagnoses for the first time that he is suffering from heart failure. Under such facts, we think it logical and reasonable to conclude, in accord with the view of his physician, that the traumatic injury he received either caused his heart trouble or, if the heart was previously diseased, that the injury aggravated or accelerated the affliction. And this, particularly in view of the fact that the counter availing proof (as we shall hereinafter point out) is not positive, but albeit, doubtful.
[1] It must be borne in mind that Dr. Jacobs' testimony is positive that there was causal connection between the traumatic injury and the subsequent heart ailment. This evidence was sufficient to make out a prima facie case for plaintiff and it thereupon devolved upon defendants to rebut it. In this connection, it should be stated that counsel for defendants remind us that the burden of proof in this case, as in all compensation cases, was upon plaintiff to establish with certainty that the injury sustained on February 8, 1943, has causal connection with the disability he now suffers. But here, as we have said, the evidence of Dr. Jacobs establishes plaintiff's claim with legal certainty unless defendants' evidence can be viewed as preponderating.
Let us therefore examine the evidence of defendants' experts. Dr. Bernhard states positively that the accident could not have aggravated plaintiff's heart disease for the *Page 500 
reason that, in order to produce traumatic heart disease, there must be a perforation of the skin or body in the region of the heart. With due deference to Dr. Bernhard, we can only say that his opinion is contradicted by defendants' other expert, Dr. Wirth, and also by Dr. Sodeman, who both concede that a heavy blow in and around the region of the heart may be sufficient to produce traumatic heart disease.
When we scrutinize Dr. Wirth's testimony, we find that, while he voices the opinion that the blow received by plaintiff did not aggravate the heart condition (which he believes existed before the accident), he admits that it is possible that a heavy blow to the head and back could activate or accelerate the disease and also concedes that a blow within the vicinity of the heart would readily affect the diseased organ. Thus, it is clear that Dr. Wirth, while ultimately disagreeing with the findings of Dr. Jacobs, recognizes, at least, the possibility of the correctness of Jacobs' conclusions.
[2] Much has been said in the briefs in the case concerning the burden of proof — that is, whether the duty rested on plaintiff or defendants to produce evidence exhibiting the nature of the blow received by plaintiff. On this score, we feel impelled to say that it is obvious that defendants were in a far better position than plaintiff to have submitted proof concerning the nature of the blow. Plaintiff, admittedly, was knocked unconscious by the blow and did not regain consciousness until he was taken to the first aid station of the shipbuilding company. Therefore, he was unable to testify, but vaguely, concerning the nature of the blow received or how he fell. On the other hand, it is apparent that the defendant shipbuilding company, operating a large plant where industrial accidents frequently occur, was in a far better position to make an investigation and produce witnesses to eliminate the possibility that the blow received by plaintiff, or the fall resulting therefrom, was such as to exclude the possibility that he suffered a trauma within the region of his heart. The only evidence produced by them, in obedience to a writ of subpoena duces tecum issued by the Court at the insistence of plaintiff, was a report that plaintiff was injured while engaged in his duties and that he was under the supervision of a foreman named Bailey. It seems likely that a competent investigation by defendants of an accident of this kind would have revealed the presence of witnesses. If there were none, this circumstance cannot be regarded to operate as a detriment to plaintiff's recovery, particularly since it is conceded by the medical experts that a blow within the vicinity of the heart would be sufficient to aggravate the condition of the diseased member.
Counsel for defendants have cited several cases involving heart ailments which they say are authority for the judgment in defendants' favor. Among them is the case of Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330. That authority is without pertinence here for the reason that it was there found that the heart disease suffered by the employee did not result from an accident. To the same effect are the cases of Kirk v. E. L. Bruce Co., La. App., 190 So. 840 and Lynn v. Arkansas Field Oil Co., La. App., 192 So. 764. The holdings in Powell v. American Employers Insurance Co., La. App.,14 So.2d 333 and Manes v. Louisiana Central Lumber Co., 4 La.App 116, are based upon the resolutions that the vast preponderance of medical evidence did not sustain the claim that the heart disability resulted from the accident.
[3] Considering the facts of this case as a whole, we conclude that plaintiff's present heart disability has been activated, aggravated and accelerated by the injury he sustained on February 8, 1943, and that, since he is totally permanently disabled, he is entitled to the relief sought.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment herein in favor of plaintiff, Bennett White, and against the defendants, Delta Shipbuilding Company, Inc., and Fidelity and Casualty Company of New York, in solido, for compensation at the rate of $20 per week beginning on March 29, 1943, for a period not exceeding 400 weeks, together with the sum of $250 for medical expenses, less a credit of $136.67 heretofore paid by defendants, and for all costs.
Reversed. *Page 501