72 So.2d 601 (1954)
SHARP
v.
ESSO STANDARD OIL CO.
No. 3803.
Court of Appeal of Louisiana, First Circuit.
April 26, 1954.
Rehearing Denied May 31, 1954.
Writ of Certiorari Denied July 2, 1954.
*602 A. M. Curtis, P. A. Casey, J. M. Carville and W. B. Holcombe, Baton Rouge, for appellant.
Brumfield, Hebert & Rush, Baton Rouge, for appellee.
CAVANAUGH, Judge.
Plaintiff sues the defendant individually and for the use and benefit of her minor child, Millie Jo Marie Sharp, for weekly compensation at the rate of $30 per week for a period of 300 weeks. Plaintiff claims that her husband, Faure J. Sharp, on November 13, 1950, while in the employ of the defendant as an assistant operator and process man at its refinery and while performing services arising out of, incidental to and during the course, business and trade of the defendant, suffered accidental personal injuries to his circulatory system and particularly his heart, when he was unable to cut off a valve or plug cock to a part of the machinery under his supervision; that the unit was used in the manufacture of gasoline, and that her deceased husband became overexerted; that on December 13, 1950, while acting within the scope of his employment and under specific instructions of the defendant and while checking gauges and valves, he suffered a fainting spell and fell out; and that the sticking of the plug cock on or about November 13, 1950, and the accident on December 13, 1950, aggravated the injuries to the heart of her deceased husband and connecting functional parts. It is further alleged that the defendant failed and neglected to furnish her deceased husband proper care and medical attention and failed and neglected through its agents and employees to properly diagnose the injuries suffered by her husband in the accidents hereinabove referred to. It is further alleged that her deceased husband received payments under a disability plan provided for by the defendant in lieu of workmen's compensation. It is further alleged that her husband died on October 19, 1951, as a result of the injuries sustained in the accidents hereinabove set forth by reason of an acute cardiac failure.
The defense to the suit is that plaintiff's deceased husband did not suffer a compensible accident arising out of, incidental to or during the course of his employment with defendant. It admitted that it paid to plaintiff's deceased husband between December 13, 1950 and October 19, 1951, sick benefits under defendant's disability benefit plan in the amount of $2623.14. Decedent's rate of pay was $2,268 per hour, or $90.72 for a 5 day week of 8 hours each day.
After a lengthy trial in the district court, at which the entire medical record of the decedent was introduced and five medical experts were heard, and after the transcription and filing of the notes of evidence, the District Judge, for oral reasons assigned, rendered a judgment in favor of the plaintiff for the weekly compensation sued for at the maximum rate of 46¼ %, not to exceed the sum of $30 per week beginning November 13, 1950, for a period not exceeding 300 weeks, subject to a credit of $30 per week for the number of weeks on which the defendant made sick benefit payments in the amount of $30 per week. The Court also awarded $500 for medical expenses and the sum of $300 for funeral expenses, together with legal interest thereon from judicial demand until paid, and all costs of the suit.
The defendant has suspensively appealed from the judgment, and the plaintiff has answered the appeal and asks the judgment be amended and the credits not allowed.
The sole question in this case is whether or not the death of plaintiff's deceased husband was caused by an accident in the course of and arising out of his employment with the defendant. The question then presented by the evidence in the case is whether or not the accident experienced *603 by the decedent on or about November 13, 1950, followed by the heart attack on December 13, 1950, has any causal connection with the disability occurring during his employment with defendant, and if it was an accelerating or contributing cause to the heart attack suffered by decedent on October 19, 1951.
The facts in the case show that plaintiff's deceased husband was employed by the defendant and commenced work for it during the year of 1928. He was laid off in 1930 and re-employed August 13, 1934. At the time of the accidents alleged in plaintiff's petition, decedent was an assistant operator of a manufacturing unit at defendant's Baton Rouge refinery. This unit was designated as Alkylation Unit No. 3, which was used in manufacturing aviation gasoline. The services of four employees are usually required to operate this unit, viz., one operator, two assistants and one helper. These employees work by shift, and the shifts were designated as A, B and C. The A shift was from 7 A. M. to 3 P. M.; the B shift from 3 P. M. to 11 P. M.; and the C shift from 11 P. M. to 7 A. M. Decedent's duties consisted primarily of seeing that this unit properly functioned in the manufacture of the gasoline and to check the various instruments, such as gauges, valves and meters during the period of his shift, and particularly at the commencement of the shift. On the date of the first accident alleged as one of the causes on which the claim for compensation is based (November 13, 1950), decedent had left the control room to open a valve on one of the towers of the unit. No other employee was with him at the time, but he apparently opened the valve and then was unable to close it, because he returned to the control room calling to his co-employees to come and assist him. The tower had to be ultimately shut down or cut off to permit the valve to cool so it could be closed. This incident caused decedent some excitement, because he had a cyanotic appearance, according to his co-employees who saw him immediately after the occurrence of the incident and who actually cut the tower off and finally closed the valve. The next incident occurring to plaintiff was on the morning of December 13, 1950, or approximately 30 days after the valve incident, when decedent walked into the control room almost out of breath complaining of pain in his chest, exhibiting a cyanotic appearance and collapsed. His co-employees placed him on a table, and he was later taken by ambulance to the hospital of the defendant. He was experiencing severe pain in the chest and was administered a hypodermic to relieve his distress. He was later examined and administered to by defendant's physicians. He was sent home and after arriving there plaintiff called Dr. Moody, the family physician, who, upon examination, found decedent to have suffered a heart attack. He had decedent rushed to the Baton Rouge General Hospital where he was treated until January 14, 1951, when he was returned home. Decedent was never able to work at any time subsequent to the incident on December 13, 1950, and was paid by defendant sick disability benefits during the time from December 13, 1950, to October 19, 1951, the date of his death. He died at Mandeville on October 19, 1951, while sitting in his automobile after returning from church. An autopsy was performed at the request of plaintiff. The autopsy showed that decedent for a long period of time had suffered from a degenerative heart disease known as myocarditis. The exact cause of death, according to the report of the pathologists, was the following:
"Anatomical diagnoses:
"1. Old massive myocardial infarction involving the anterior interventricular septum, anterior and lateral aspects of the left ventricular wall, due to complete thrombosis of anterior descending branch of left coronary artery.
"2. Coronary insufficiency due to above and due to arteriosclerotic degenerative changes in the left circumflex artery.
*604 "3. Pericardial effusion, severe.
"4. Right fibrous pleuritis, severe.
"5. Contracted kidney, right side.
"Microscopic description
"Heart: Sections through anterior descending branch of left coronary artery show complete occlusion of the lumen by degenerative arteriosclerotis changes and old thrombosis. There is no residual lumen at all in the sections taken. Sections through the myocardium show well organized fibrosis in the region described grossly as affected by the old coronary occlusion. Sections through the myocardium generally show no evidence of recent infarction."
"Summary of case
"Death of this individual was due to acute cardiac failure resulting from coronary insufficiency. There was an old massive myocardial infarction involving the anterior septum and anterior and lateral aspects of the left ventricular wall due to old thrombosis of the anterior descending branch to the left coronary artery. The coronaries were further insufficient due to the fact that the left circumflex coronary artery also showed severe degenerative arteriosclerotic changes with subtotal occlusion of lumen. To further embarrass the cardiac function was a severe pericardial effusion."
During decedent's confinement in the hospital from the date of the attack on December 13, 1950, to January 14, 1951, cardiograms were taken of decedent's heart. These cardiograms showed that decedent had suffered some injury to the heart muscle which had produced a coronary thrombosis and infarction. The entire hospital record and employment record of decedent were filed as evidence in the case and have been carefully studied and examined, along with the evidence. Decedent had developed hypertension as early as 1937. It had progressed to such a state by 1947 that a sympathectomy was recommended by the Oschner Foundation Hospital, and it was performed. Decedent's blood pressure was temporarily lowered, but on account of his age, he was advised that it perhaps would not give him any permanent relief. Arteriosclerosis developed, along with this hypertension.
Defendant from time to time conducts periodic examinations of its employees, when any illness or accidents happen, and after decedent had undergone the sympathectomy, one of these examinations was made, and it was determined that he was physically able to do and perform his duties as an assistant operator, but that he should avoid any undue excitement or climbing in the performance of his work on account of his hypertension. The record shows that the work performed by decedent was not strenuous in the sense that it required any heavy lifting, as most of his duties were sedentary, and the equipment was automotically operated from the control room by devices provided for therein, and only occasionally decedent would have to leave the control room to go outside and inspect or examine certain parts of the unit. Decedent's work, however, did require attentiveness and precision on account of the various mechanisms and devices he had to look after.
Plaintiff claims that the tension, nature and character of the work her husband was performing, together with the two incidents related to, while suffering from hypertension and the cardiac and vascular condition, superinduced, activated and accelerated that condition until it brought on the coronary thrombosis or occlusion suffered by decedent on December 13, 1950, which totally incapacitated him to do and perform his work.
The decedent rode a bicycle to and from his work. On the morning of the attack of December 13, 1950, he travelled from home to the plant of defendant by this method of conveyance. The record is not clear whether it was motor propelled or whether it was propelled by the feet and legs. The distance from his home to the plant and how far he had to travel is not reflected by the record. Whether or not he experienced *605 any difficulty in reaching the plant on account of traffic conditions is not shown. The record does show from the testimony of the witnesses who were present when he entered the control room, as well as the hospital record made by defendant, that he was suffering acute pain and holding his chest preceding the collapse. The distance from the point of entrance to defendant's premises he had to walk or the place where he parked his bicycle is not disclosed.
The argument is made by the defendant that decedent had not entered upon his duties at the time he suffered an attack and was not performing any work assigned to him and that the only connection between the attack and his work, insofar as the particular time it happened is concerned, was that it was experienced on the job. It also argues that the incident on November 13, 1950, was not a contributing cause because the fright or shock was transient and passed off, and decedent worked every day or continued his employment regularly between November 13, 1950, and December 13, 1950, and reasons that there was no causal connection between the accident on November 13, 1950 and the disabling heart attack on December 13, 1950.
Plaintiff contends that the nature and character of the work performed by decedent and the constant strain by that work upon his previously existing impaired physical condition brought about the disabling condition happening on December 13, 1950, which brought about the total disability.
The resolution of this question depends primarily on the medical evidence adduced on the trial of the case. Drs. William H. Moody and Richard Selser testified for the plaintiff, and Drs. Howard Hansen, Emile Lobrano and Neil K. Weaver testified for defendant. Dr. William H. Moody was plaintiff's family physician, and treated decedent following the heart attack on December 13, 1950, and continued to look after him until his death. The autopsy was made at his request. He is not a cardiac specialist, but has had considerable experience in the treatment of cardiac diseases in his ordinary practice. It is his opinion that there is a possible outside causal connection between the accident happening on November 13, 1950, and the heart attack experienced in the control room on December 13th. He is frank to state, however, that with the hypertension and arteriosclerosis with which decedent was suffering at the time, he should have avoided any exertion, excitement and that any exertion or excitement would increase decedent's blood elevation, which, in turn, brings about the coronary thrombosis or occlusion. It is the opinion of all of the experts that medical science has never determined the cause of hypertension; that a patient who suffers from it has to curtail and reduce his normal activities in order to protect against a catastrophe which usually follows a stress or strain or any undue excitement. It is Dr. Selser's opinion, after studying and reading the medical history of the decedent and analyzing that history, together with the actual happenings and occurrences in the light of decedent's work and from interpretation of the cardiograms that there is a causal connection between the incident of November 13, 1950, and the heart damage suffered by the decedent in the nature of an infarction on December 13th. There is no doubt according to the findings of the pathologist in conducting the autopsy, as agreed to by all of the medical experts both by plaintiff and defendant, that the scar tissue reflected from the autopsy was brought about by the incident on December 13, 1950. The testimony of Dr. Selser is that the formation of these wart-like substances in the arteries do not take place instantaneously, but are formed from a gradual process until it reaches a stage where it sloughs off and gets into the blood stream. There will be a partial occlusion. If it is large enough and causes a complete stoppage, then the moment of dissolution is instant. If this heart condition was aggravated and a non-symptomatic thrombosis set in motion, a condition which was to reach a disabling stage 30 days hence, it is our opinion that it would be compensable. If the work the decedent was doing either mentally or physically acted upon decedent's impaired heart to bring about the formation of one of these thromboses, it would likewise be a compensable accident.
*606 In harmonizing the medical testimony as to whether or not plaintiff's husband suffered a thrombosis on November 13, 1950, we find that the medical experts agree that a thrombosis could have occurred without symptoms or without producing any immediate physical disability. The medical evidence shows that a thrombosis can be symptomatic or non-symptomatic. The medical evidence is certain that the thrombosis suffered by plaintiff's husband on December 13, 1950, with ischaemia culminated in the coronary infarct reflected in the cardiograms between December 13, 1950 and December 23, 1950. The medical testimony is that it is within the realm of possibility for these non-symptomatic thromboses to have resulted from the incident experienced by plaintiff's husband on November 13, 1950, while in defendant's employ without producing any immediate disability. It is the testimony of plaintiff that on the evening following the incident on November 13, 1950, her husband suffered pain in his chest. On the morning of December 13, 1950, when he left home for his work, he was in good spirits. It is the testimony of plaintiff's expert, Dr. Selser, that this incident on November 13, 1950, was the prelude of the severe one decedent suffered in the control room on December 13, 1950. Under this evidence we can not say that the Trial Judge has committed manifest error because there is sufficient evidence to support his finding of a causal connection between the accident suffered on November 13, 1950 and that producing disability which occurred on December 13, 1950 and which was definitely established by the autopsy. White v. Delta Shipbuilding Co., La.App., 24 So.2d 497.
The testimony of Dr. Hansen, Medical Director of defendant who looks after all of defendant's employees, appraises their physical qualifications for employment assignment, is that there is no causal connection between the incident of November 13, 1950, and that of December 13, 1950, and the death of decedent on October 19, 1951. It is his testimony that decedent was suffering from hypertension and cardiovascular disease which could have caused his death at any time without any physical exertion whatever. He had been director of defendant's hospital for approximately two years when decedent suffered the incident on November 13, 1950. If there was a causal relation, he stated that it would happen immediately and at the time of the incident. But that since decedent did not fall out when he experienced the fright or shock on the happening of the first incident, the functioning of his heart returned to its normal condition and that the effect of the incident passed away. It was his opinion that decedent was fully physically able to do and perform the work assigned to him without endangering his life or bringing on one of these heart attacks; that he did not suffer as much anxiety and worry in doing his work as he would have if his employment had been terminated on account of his debilitated condition.
The crucial question presented by the medical testimony in this case is whether or not the accident suffered by plaintiff's deceased husband on November 13, 1950, contributed to or accelerated the totally disabling heart attack suffered by him on December 13, 1950. Defendant's medical director, Dr. Hansen, and his assistants had examined plaintiff's husband on November 3, 1950, or just ten days prior to the time he experienced the first accident. It was their opinion, notwithstanding extensive hypertension, that he was physically able to perform his duties as an assistant operator at defendant's alkylation plant. It also was his opinion that the decedent had experienced non-symptomatic thrombosis with ischaemia but not producing disability until the one occurred on December 13, 1950, and that after that date, the plaintiff's decedent was totally disabled because of so much death of the heart muscle. The pertinent part of his testimony which we believe shows that there is a causal connection between the accident of November 13, 1950, and that following on December 13, 1950, is as follows:
"Q. Right on that point my mind keeps going back to some statement you have made. All I want is your opinion, I don't care what it is, all I want is *607 facts and an opinion, but what I want to know is after December 13, 1950, after he had this attack in the plant did you consider that it would have been proper for him to have exerted himself in the operation of his work, pulling valves or riding a bicycle, climbing steps, or doing any other kind of physical exercises he felt like he wanted to do? A. No, sir, I don't believe that would have been proper for him to engage in any physical activities that he might have felt like he was able to do.
"Q. Now, why? A. Because he had such an extensive scar over the left ventricular wall in the heart muscle that the reserve, the heart muscle was just not capable of supplying blood to the body tissues and to the muscles
"Q. Well, what if heA.which would permit that man to do physical exertion.
"Q. Well, if he felt able himself to do it, would the doing of it react badly on his condition? A. That is something that we would have to measure, in other words when we have an individual like that that we want to find out he feels like he is able to do his regular work and he has had such a condition as this, on examination we try to ascertain just how much physical exertion that individual can do without going to the point of ischaemia or lack of sufficient oxygen where he can do that exertion.
"Q. What I want to know is would this exertion have aggravated his condition or made it worse from what it was before he made the exertion? A. Exertion beyond the capabilities of his heart muscle would have aggravated his condition.
"Q. Now, if it would have aggravated his condition after December 13, 1950, why wouldn't it have aggravated it between November 13th and December 13th? A. I think I answered your first question hastily. I am sorry. May I go back and state that it will depend upon the degree of over-exertion that he performed after December 13th as to whether or not there would have been any aggravation of his condition. If that exertion had been within the limits of his heart muscle to withstand it there would have been no aggravation. If it were beyond that limit of the heart muscle to withstand the period of ischaemia, portions of the heart muscles would have probably died and there would have been aggravation of his condition. I say that it did not aggravate it prior to December 13, 1950, because the evidence points that he was not disabled in any way that we know of between November 13 or thereabouts and the onset of his disability on December 13th. I believe that people have pointed out that he felt reasonably good and that he even on the morning of December 13th he felt fine, with no symptoms of illness, and so we have no medical evidence that prior to December 13th there was sufficient damage or any damage from exertion that resulted in any permanent damage or aggravation of any pre-existing condition.
"Q. Knowing that he had these conditions on November 13th when he went to work and assuming that he endeavored with every ounce of physical strength that he could muster to close this valve, do you have any opinion as to whether the exertion of every ounce of physical strength he could not once, but maybe more than once, was good or bad for him or indifferent? A. We have no evidence that it was good, bad or indifferent.
"Q. But then when you said a moment ago that you did not believe there was any possibility of that exertion on November 13, 1950, having contributed to a worsening of his condition, is there any degree of exertion to which he should have limited himself on that date? A. Not that we know of.
"Q. Well, then, as I understand it, as a physician you do not believe in *608 curtailing activities until a man's heart condition is progressed to the state of where he himself is physically unable to get about, is that right? A. That's not right, no, sir. That physical activity has to be one incident of all the exertion that an individual can exert, whether that is lifting or pulling, there is a different story than, on the tissues of the heart muscle than is sustained in physical exertion, and so that there is definitely in the place of hypertension that is symptomatic a point where that we would request that the individual's physical activities be limited to that within which we think that he can stand satisfactorily. Occasional exertion it is almost impossible toone single twist on a valve an individual can certainly find out with momentary exertionall that he can force on there whether or not thing is stuck so he can open it or not. It is not sustained prolonged physical exertion, the type of thing that is very detrimental to these types of individuals."

* * * * * *
"Q. And that such a sudden occasion as that in your opinion could not bring about any injury to the heart or coronary or caused it to be hurt in any way, is that your testimony? A. It is my testimony that I don't believe that that particular exertion on that particular day aggravated any pre-existing condition in Mr. Sharp. Now, I think that a violent exertion of indeterminate duration has contributed to the failure of hearts.
"Q. Then you are saying that such an occasion, under the circumstances as I have related to you, could bring about an injury to the heart and be bad on it? Is that right, sir? A. That's within the realm of possibility. Yes, I think it is within the realm of possibility."
And this expert further testified:
"Q. Now, it could very well be that that thrombosis could have occurred November 13th, November 15th, or prior to the date upon which the electro-cardiograph was made, is that right? A. No sir.
"Q. Is it your testimony that the electrothat the thrombosis that those electro-cardiograms show was formed or occurred on the date of the electro-cardiogram? A. The electro-cardiogram shows that the diffuse anterior infarct occurred between the electro-cardiogram taken on December 18th and the one that was taken on December 21st. I speculated in explaining the mechanism of how this thing developed that there were small infarcts, or small thromboses developing in this individual from December 13th up until he had the infarction or the death of the cardiac muscle that was manifest on December 21st. Now, that infarction could have occurred anytime between the time the electro-cardiogram was taken on December 18th and the one taken on December 21st. I don't know the clinical course of the disease of the patient so electro-cardiographically that's when it occurred.
"Q. And in this patient the small thromboses could have occurred previous to that time? A. Not previous to December 13th.
"Q. Would a small thrombosis show in electro-cardiogram? A. Let's put it this way: A symptomatic thrombosis. There is no evidence of a symptomatic thrombosis occurring with ischaemia of the heart muscle prior to December 13th. Non-symptomatic thromboses more likely occurred but did not result in disability or the death of the heart muscle prior to December 13th.
"Q. And a thrombosis of that nature could have occurred on November 13, 1950? A. Oh, yes, it is within the realm of possibility. I don't believe it did from the evidence submitted."
There is no doubt in our mind when we consider the above testimony of Dr. Hansen with that of the unit Operator Hooper to the effect that plaintiff's deceased husband *609 was suffering pains in his chest and arms and his complaint to this witness at various times during the six months previous to the accident on November 13, 1950, that his effort in attempting to close the cock or valve was at least a contributing cause superinducing the thrombosis and coronary infarction which led to his total disability and ultimate death.
Speaking of the accident happening on November 13, 1950, as being a contributing cause to the thrombosis, followed by the infarction, Dr. Selser testified on cross-examination as follows:
"Q. You stated that stress and strain and anxiety state and exertion would precipitate a thrombosisI withdraw the question, please. You stated that stress and strain and anxiety state or exertion could possibly precipitate a thrombosis? A. Yes, sir, that would be contributory factors.
"Q. What degree of possibility exists in those cases as to the causal relationship between the strain and the thrombosis? A. I think it would be a very direct thing. I think you have tothere again it would be fair to anyone to say definitely that it would or would notbut I think, depending upon the type of patient that you had and upon how serious it was and how serious the strain was, and his emotional personality, etc., and then, under suitable circumstances, it is quite conceivable it would be a very direct cause. On the other hand, it may happen to some other people and apparently cause no trouble at all. It is a possibility, a very definite possibility."
The pivotal point with which we are concerned here is if the exertion put forth by decedent in attempting to close the cock or valve which at that time produced within his body a precipitating cause which, together with his already damaged heart and the subsequent incidents in going to work on the morning of December 13th, brought about his fatal collapse; it is our opinion that there is a causal connection between the accident suffered by him on November 13, 1950, and the almost fatal attack he suffered in the control room. We are fortified, as was the District Judge, in our conclusions in weighing this evidence along with that of the lay witnesses who were present and working with him when he showed the paleness, blueness around the lips, and cyanotic appearance following his attempt to close the valve or cock. The evidence of his immediate superior is that he was suffering pains in the arms and chest, which are symptoms of a person suffering from a diseased heart.
Now, the evidence of Dr. Weaver and also Dr. Lobrano shows that the accident experienced by plaintiff's deceased husband on November 13th could have been a contributing cause to the acute attack suffered by him on December 13th. While each of these eminent physicians expressed the opinion that they do not think that it was a contributing cause because he was not totally disabled at the time it happened. When we try to evaluate their conclusion along with the findings and conclusions made from the autopsy, as well as the diagrams made by defendant's experts showing the location on the heart where these anatomical changes took place and the opinion of the experts when they happened, the conclusion is inescapable that each one of these non-symptomatic thrombosis at least contributed in the beginning to bring on the disabling attack finally suffered by decedent in the control room.
A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says "possible" or "probable", he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. *610 To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a common-sense way.
"The distinction between probability and possibility should not follow too slavishly the witnesses' choice of words, as sometimes happens in respect to medical testimony. A doctor's use of such words as `might', `could', `likely', `possible' and `may have', coupled with other credible evidence of a nonmedical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award. It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. He will testify that the sledge-hammer blow on claimant's head might have caused claimant's headache, but hesitates to say positively that this was the only possible cause, and may concede on cross-examination that there could conceivably be other causes. The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation." Larson's Workmen's Compensation Law, Vol. 2, § 80.32, page 322.
If death follows immediately after an exertion such as walking up a flight of steps, turning on a valve, or witnessing a catastrophe, the causal connection would be inferred without any hesitancy. The difficult problem is to associate the accident with the injury.
Defendant seriously contends that too long an interval of time existed between the accident on November 13, 1950, and that following on December 13, 1950, to establish a chain of causation. Who can speculate what deleterious effect a thrombosis or a coronary infarction has on an already existing impaired diseased heart? The decedent showed signs of the condition described as ischaemia while performing his work and brought on by his work. We understand this term to mean a lack of oxygen in the blood. He would not have been permitted to have worked if defendant's medical director had known that his physical condition had reached this stage, because his testimony shows that he should have refrained from any effort producing this condition and it would have aggravated his condition.
If the evidence in this case does not establish a direct causal connection between the two incidents, it is so impelling that it would have to be inferred.
Southern Stevedoring Co. v. Henderson, 5 Cir., 175 F.2d 863; Masse v. James H. Robinson Co., 1950, 301 N.Y. 34, 92 N.E.2d 56; Bussey v. Globe Indemnity Co., 81 Ga. App. 401, 59 S.E.2d 34; White v. Delta Shipbuilding Co., La.App., 24 So.2d 497; Dortch v. Louisiana Central Lbr. Co., La. App., 30 So.2d 792.
Defendant has referred us to the following cases in support of his contention that the thrombosis and myocardial infarction occurring on December 13, 1950 could have no causal relation with the accident occurring on November 13, 1950: Becton v. Deas Paving Co., Inc., 3 La.App. 683; Wright v. Louisiana Ice & Utilities Co., 19 La.App. 173, 138 So. 450; Renfrew v. Caddo Parish Police Jury, La.App., 155 So. 291; Johnson v. Zurich General Accident & Liability Insurance Co., La.App., 161 So. 667; Ozbolt v. Weber-King Mfg. Co., La. App., 193 So. 383; Murray v. Mengel Co., La.App., 9 So.2d 818; Hester v. Tremont Lumber Co., La.App., 15 So.2d 94; Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625; Lampkin v. Kent Piling Co., Inc., La.App., 34 So.2d 76; Bass v. Weber King Mfg. Co., 13 La.App. 179, 125 So. 456; Lynn v. Arkansas Fuel Oil Co., La.App., 192 So. 764; Linn v. Terrell Compress Co., La.App., 142 So. 193; and Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330. In most of these cases where recovery *611 was permitted, the death occurred either on the job or a short time after the exertion. We have studied and considered each of these cases in the light of the evidence on which the decisions were rendered, as well as the time of their pronouncement. They are not controlling here because the evidence shows a causal relation between the effort put forth by plaintiff's deceased husband on November 13, 1950 and the resultant collapse following on December 13, 1950, and although the unusual exertion or unusual exposure happening to decedent was not very great, it was sufficient to excite decedent and bring on the condition of ischaemia. Workmen's Compensation Law, Larson, Volume 1, Sections 38.10-38.83.
We do not see any difference in heart cases where the evidence shows a causal connection and cases where the death or disability was brought about by an accident arousing some other type of disease where it is found that the accident was one of the contributing causes. The question to be decided in each case is whether or not the proof is sufficient to establish a causal connection.
"It is now well settled that to constitute an accident within the meaning of the Workmen's Compensation Law in cases where the work of the claimant entails regularly heavy physical effort, it is not necessary that the injury from which disability follows be the result of unusual physical effort. If a diseased organ gives way while the laborer is performing his usual and customary heavy duties, and disability results, it is compensable. This doctrine is affirmatively established by the following cases, viz.: Jackson v. Travelers' Insurance Co., 180 La. 43, 156 So. 169; Renfrow v. Police Jury of Caddo Parish, La.App., 155 So. 291; Biggs v. Libbey-Owens-Ford Glass Co., Inc., La.App., 170 So. 273; Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330; Hill v. J. B. Beaird Corp., La.App., 19 So.2d 295." Dortch v. Louisiana Central Lumber Co., La. App., 30 So.2d 792, 796.
Our conclusion in this case is fully supported by the decision in White v. Delta Shipbuilding Co., supra, and Dortch v. Louisiana Central Lumber Co., supra, to maintain a causal relation between the two accidents.
The Lower Court allowed the defendant credit for the sum paid as sick benefits as compensation. The plaintiff has asked that that part of the judgment be reversed. They were not paid as gratuities, but as a sum of money due plaintiff by reason of his prior service and its discontinuance, the reason for which at that time was sickness and which has later been determined to have been an industrial accident. The same plan which provided the sick benefits provided for disability benefits from the accident. Defendant will be allowed credit for these payments in the amount of $30 per week as was allowed by the District Judge for the period from December 13, 1950 to October 21, 1951. Daigle v. Higgins Industries, La.App., 29 So.2d 374; Goodman v. Hillyer, Deutsch, Edwards, Inc., La.App., 49 So.2d 60. The Lower Court fixed the date of the accident as November 13, 1950. The record in the case shows that plaintiff's husband was not disabled until the accident of December 13, 1950, and the date of the compensation will commence at that time.
For the reasons assigned, the judgment appealed from is amended by fixing the date of disability of plaintiff's deceased husband, Faure J. Sharp, to have been December 13, 1950, and, as thus amended, the judgment is affirmed.