250 So.2d 38 (1971)
Peyton JOHNSON, Plaintiff-Appellee,
v.
EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Defendant-Appellant.
No. 3436.
Court of Appeal of Louisiana, Third Circuit.
June 22, 1971.
*39 James L. Davis, Many, for defendant-appellant.
John P. Godfrey, Many, for plaintiff-appellee.
Before SAVOY, MILLER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
On June 1, 1967 while plaintiff was engaged in performing his duties as a lumber stacker for his employer, Boise Cascade Corporation, he was struck on the lower portion of his face by a piece of metal that was attached to a cable when the cable suddenly snapped. He was rendered unconscious by the blow which fractured his jaw in several places completely separating it from the middle third of the face, knocked out most of his teeth, and produced a number of lacerations. He was taken to the Fraser Hospital in Many, Louisiana where he was seen by Dr. Fred Thomas. Dr. Thomas cleaned the lacerations, administered a tetanus booster injection and some Ringers solution, and then because of the seriousness of the injuries, transferred him by ambulance to Schumpert Hospital in Shreveport, Louisiana.
There he was seen by Dr. Kellett, a general surgeon who sutured some of his lacerations and Dr. Cush, an oral surgeon who repaired his jaw injuries. The latter described plaintiff's injuries as follows:
"* * * He had a fracture of the maxilla, a horizontal fracture of the maxilla above the teeth, completely separating the upper jaw from the middle third of the face. He had bilateral fractures of the condyles or the small portion of the mandible that inserts into the joint. And multiple lacerations of the oral mucosa and gingiva and lips and face surrounding. These multiple lacerations of the face and lips were sutured by Dr. Kellett that p. m. Fractures of the alveolus, which is the bony socket that the teeth are anchored to, of the maxilla and mandible, the alveolus of the maxilla and mandible, and there were multiple fractures of the teeth. The maxilla was floating and the middle third of the mandible was also floating. In other words, he had fractures just about everywhere in his maxilla and mandible * * *"
Because plaintiff was still unconscious, it was determined that the initial operation to repair his injuries should be performed in the emergency room without anesthesia. The procedure consisted of a closed reduction of the fracture fragments, and alignment of the jaw, as well as the removal of several loose teeth, bone fragments and portions of the gums. To hold the remaining bone fragments in place during the healing period, an Erich splint, which consists of a metal bar attached to the teeth *40 with stainless steel wires, was inserted. The effect of the Erich splint is, of course, that the patient's jaws are rendered immobile, thus plaintiff could not open his mouth for two months, the length of time that he wore the splint. During those months plaintiff subsisted on a purely liquid diet ingested through a straw.
Four months later plaintiff again underwent surgery involving the extraction of his remaining teeth, removal of roots imbedded in the jaws, and trimming and shaping of the bones, etc. as required for the fitting of dentures.
The temporamandibular joints of plaintiff's jaw did not heal properly and he was ultimately left with a thirty per cent limitation of the up and down movement of his jaw and almost complete loss of side to side motion. Further, he was forced to wear false dentures which, according to the medical testimony, are only about 25 per cent as efficient as natural teeth.
Approximately six months after his accident, plaintiff began displaying the symptoms of heart disease in the form of arteriosclerosis, and hypertension. Roughly one month after he was given the diagnosis of heart disease, he developed an extensive ulcer. Additionally plaintiff was suffering from headaches, dizziness, general weakness, and a right inguinal hernia.
The defendant, as the workmen's compensation insurer of plaintiff's employer, paid him workmen's compensation benefits of $35.00 per week for 100 weeks, based on the injuries to his jaw, and then terminated compensation. Plaintiff, believing himself to be totally and permanently disabled then filed the instant suit seeking benefits for total permanent disability and for penalties and attorney fees. The trial court rendered judgment in favor of plaintiff, awarding him damages for total permanent disability, but denied his request for penalties and attorney fees. The defendant appealed that judgment to this court, but plaintiff, apparently being satisfied with the judgment, did not answer the appeal.
It is not disputed in this court that plaintiff is totally and permanently disabled within the meaning of the Workmen's Compensation Act and both parties agree that the only issue before us is whether the plaintiff has proved his disability to be the result of his June 1, 1967 accident.
The theory of plaintiff's case is that the ailments that appeared after the accident, i. e., the arteriosclerosis accompanied by angina pectoris, the hypertension, the ulcer and plaintiff's headaches, dizziness and weakened condition are the direct consequence of the accident. Further, it is plaintiff's position that anyone of those maladies would be disabling, and that taken together, they certainly are so.
To show the connection between his accident and his disability, plaintiff introduced the testimony of both lay and medical witnesses.
Generally the lay witnesses testified to the effect that, prior to the accident, plaintiff was robust and in good health and that he was a good and steady worker, providing well for his large family. Following the accident however, plaintiff was unable to eat anything but liquid or pureed foods except with the greatest difficulty and he became emaciated in appearance. He complained continuously of pain, shortness of breath, and dizziness and he could not work. Also they knew the plaintiff to worry constantly about the state of his health and the financial difficulties brought on by his inability to work.
The physicians who treated plaintiff were the three aforementioned and Dr. S. F. Fraser. Additionally, plaintiff was examined by four other physicians who offered their views through depositions. Of these seven physicians, only one, Dr. Joe E. Holoubeck would categorically state that there was no connection between plaintiff's disability and his accident. The testimony of the remaining six was indicative of a general opinion that the stress, worry and physical pain which plaintiff suffered as a result of his crushing injury, *41 are the type of factors that would aggravate and make symptomatic a previously existing, but asymptomatic, condition of arteriosclerosis. They also indicated that some of the drugs which were administered to plaintiff were ulcerogenic, i. e., tended to produce ulcers, and that a tense, worried or emotionally disturbed individual would be a likely candidate for ulcers.
Dr. Cush testified that he had continued to treat plaintiff for approximately one year after the accident and that he was still complaining, as he had continuously, of headaches when he saw him last. He also noticed that plaintiff appeared to be under stress and worried about his family's welfare. Dr. Cush commented that plaintiff "* * * was only a shell of the man he was originally," that he had lost a great deal of weight and that he could not do the type of work he had done before.
Dr. Fraser, who had been plaintiff's family physician for some 20 years, began treating him for the problems in question roughly one year after the accident. He stated that he found plaintiff to have arteriosclerosis, myocarditis, and an active or recently healed ulcer, in addition to the impairment of mastication. He also stated that plaintiff had never shown any symptoms of any of these maladies before the June 1, 1967 accident. Considering plaintiff's complaints of dizziness he expressed the suspicion of damage to the vestibular nerve which controls equilibrium. It was Dr. Fraser's opinion that plaintiff was disabled from doing any sort of heavy labor and that his disability could well have been the direct result of his injury since the stress factors that plaintiff was subjected to are the sort of factors that could aggravate a condition of arteriosclerosis and produce ulcers.
After a few months Dr. Fred Thomas took over the treatment of plaintiff from his associate, Dr. Fraser, and he hospitalized plaintiff for heart trouble in December of 1968. His testimony was corroborative of that of Dr. Fraser. It was Dr. Thomas' opinion that the ulcer was caused either by the stress and tension that plaintiff suffered or by the ulcerogenic drugs that were given him; or perhaps by both factors. While he did not say that the injury to plaintiff's jaw caused his heart disease, he did opine that it caused the appearance of the symptoms that now disable plaintiff and he considered that injury to be the "igniting factor" in producing plaintiff's ailments. Dr. Thomas felt that plaintiff had been continuously disabled since June 1, 1967 due to a combination of his ailments, all of which were interrelated.
Condensing the foregoing evidence, we find that plaintiff had a pre-existing but asymptomatic condition of arteriosclerosis and that otherwise he was in good health prior to his accident. Following the accident, and as a direct result thereof, he underwent a great deal of worry and emotional stress, two factors which can aggravate and make symptomatic a pre-existing condition of arteriosclerosis. Plaintiff's condition did, in fact, become symptomatic and the angina pectoris by which it manifested itself was disabling. In addition plaintiff developed an ulcer which could have resulted from the worry and emotional stress and from some ulcerogenic drugs which he was taking. Because of the improper healing of his jaws, plaintiff was suffering from dizziness, headaches, and a serious impairment of his masticating ability that directly produced a weakened condition which could, in itself, be disabling of the heavy manual labor which was his usual occupation.
As frequently happens in cases of this type, the medical experts were reluctant to unequivocally commit themselves on the issue of causation. Thus their testimony is replete with such words as "might" and "could", and for the most part, they scrupulously avoided any expression of certainty. Bearing in mind the inexact nature of their science, however, and combining the foregoing summary of their opinions with the sequence of symptoms and the lay evidence, we conclude that plaintiff has met the requirement that he prove causation to *42 a reasonable certainty. Griffin v. Employers' Liability Insurance Co., La.App., 186 So.2d 349; Sharp v. Esso Standard Oil Co., La.App., 72 So.2d 601.
We also take note of our well settled jurisprudence to the effect that an employer takes an employee as he finds him and may not escape workmen's compensation liability because the injury produced disability only because of a pre-existing condition and would not have disabled a healthy employee, or because the injured employee's condition would eventually have produced disability even without the accident, Clement v. Fidelity & Casualty Co. of New York, La.App., 220 So.2d 575.
Considering all of the foregoing we find ourselves unable to accede to defendant's contention that the trial judge committed manifest error in deciding that plaintiff's disability was the result of his job related injury, and manifest error not being present, we must and will affirm the trial court.
Accordingly the judgment of the trial court is affirmed at defendant-appellant's cost in both courts.
Affirmed.