87 So.2d 386 (1956)
Laura Fussell CLIFTON, Plaintiff-Appellee,
v.
Sam ARNOLD, d/b/a Arnold's Sawmill, Defendant-Appellant.
No. 4164.
Court of Appeal of Louisiana, First Circuit.
April 27, 1956.
Rehearing Denied May 25, 1956.
*388 Ponder & Ponder, Amite, for appellant.
Richard M. Mathews, New Orleans, for appellee.
TATE, Judge.
This is a compensation suit. Plaintiff widow seeks recovery for the death on August 17, 1954, of her husband, Joseph S. Clifton, who allegedly died as the result of an accident sustained eight days earlier in the course of his employment.
Decedent's death allegedly resulted from the aggravation of a pre-existing cardiac condition as a result of an industrial accident, wherein decedent slipped and fell and sustained a lumbo-sacral strain, as well as severe bruises of the hip and groin.
Defendant denies that an accident occurred in the course of decedent's employment and further defends on the ground that decedent died from natural causes and not as a result of any traumatic aggravation of his cardiac condition.
The defendant attacks the District Court's finding that an accident had occurred as based solely on hearsay evidence.
There were no eyewitnesses testifying as to the accident. All decedent's co-workers (still employed at date of trial by defendant employer) testified that they had not seen decedent fall at work. Some of them further testified to their belief that they would have seen decedent fall if he had done so. Further, defendant employer testified that on the morning of August 9th when he picked decedent up before the workday on which the accident occurred, decedent mentioned having fallen the previous week. Doubtless, if accepted by the District Court, this testimony would support a finding by the District Court that no accident had occurred.
But there is other strong testimony, preponderant when accepted by the District Court, which proves that indeed an accident had occurred as alleged during decedent's day at work on August 9th with defendant. His physician had seen him Sunday, August 8th and decedent was well and unbruised. Decedent's wife and daughter testified that he had left for work the morning of August 9th unbruised, but returned that night (picked up and returned personally by defendant employer) with fresh bruises on his back and leg, which were then rubbed by his wife and daughter. He told them he had slipped and fallen at work that day.
Defendant objects strenuously to the admission of this testimony of what decedent told his wife and daughter on his return from work as hearsay (and not within the res gestae rule as too remote from the accident), as well as of the other testimony from the doctor and various lay witnesses as to decedent's subsequent statements of his fall at work. Certainly, in this workmen's compensation suit, the statements of the decedent to his wife and daughter upon his return from work as to the cause of the injuries received during the day are admissible, Arriggton v. Singer Sewing Machine Company, La.App., 16 So. 2d 145, certiorari denied; Butler v. Washington-Youree Hotel Company, La.App., 160 So. 825; see also, Zito v. Standard Accident Insurance Company, La.App. 1 Cir., 76 So.2d 25; Duracher v. Canulette Shipbuilding Company, La.App. 1 Cir., 21 So.2d 100.
In a compensation suit, "The court shall not be bound by technical rules *389 of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence," LSA-R.S. 23:1317. "`Competent evidence' is that which is relevant and material to the issue to be determined. Joseph A. Coy Co. v. Younger, 192 Okl. 348, 136 P.2d 890, 891. * * * On review by circuit court of an award of the Workmen's Compensation Board, the board's findings of fact cannot be disturbed if sustained by any `competent evidence', which means evidence that tends to establish the fact in issue and does not rest on mere surmise or guess. Black Motor Co. v. Spicer, 290 Ky. 111, 160 S.W.2d 336, 337. By `competent evidence' is meant that which the very nature of the thing to be proved requires as the fit and appropriate proof in the particular case. Horbach v. State, 43 Tex. 242, 249." 8 Words and Phrases, Competent Evidence, p. 354.
However, even in a compensation proceeding there may be limits to the admissibility of hearsay evidence of a claimant's statements, as when made long after the event and in circumstances which indicate a self-serving nature to aid a pending lawsuit, see e. g., Jack v. International Paper Company, La.App., 56 So.2d 875, Stovall v. Thomas Lumber Company, La.App., 189 So. 379.
Whether or not the various other statements made during the week before his death by decedent as to his fall at work were admissibleand we expressly do not decide this pointwe feel that the accident at work in this suit is preponderantly proved by the testimony accepted as credible by the District Court of decedent's wife and daughter as to decedent's bruises and explanation therefor after his return from work on August 9, 1954, said bruises being corroborated by the physical examination of a physician on August 12th.
It perhaps should be added that decedent's son testified that defendant Arnold stated to him at the funeral that decedent had fallen at work (Tr. 129-130), which if accepted as correct by the trier of fact is admissible as proof of the accident itself, being an admission against interest by defendant, Gulf Refining Company v. Bagby, 200 La. 258, 7 So.2d 903, Aetna Finance Company v. Betz, La.App., 35 So.2d 909. On the final day of this rather protracted trial, defendant Arnold seems to have tacitly admitted the accident when he testified: "I feel I am plumb clear is why I am fighting it [i. e., the law suit], because I have had accidents bigger than this on the job with no law suits, no questions asked or nothing. There was bigger accidents than this was." (Tr. 303.)
A more substantial controversy is presented as to whether the accident at work caused or proximately contributed to decedent's death.
Decedent Clifton worked the remainder of the day (August 9th) following the accident, and he returned and worked through the following day (August 10th). Defendant's witnesses deny, plaintiff's witnesses testify, that decedent complained of pain or strain during this time.
On August 11th, decedent remained home in bed. On August 12th, his family physician (Dr. Jacob Kety) examined him, found him suffering from lumbosacral strain, and placed him in traction. Dr. Kety noted the large bruises on the left thigh and flank and the patient's complaints of back and chest pain. With regard to the latter pains, Dr. Kety specifically checked decedent for cardiac effects of the injury, but none were clinically evident on August 12th.
On August 16th, while in bed decedent suffered a massive coronary occlusion, or heart failure, from which he died on August 17th.
Dr. Kety described the mechanism of death in these words, Tr. 13:
"My opinion is that in this individual there was a normal amount of arteriosclerosis present. Arteriosclerosis is a generalized disease. Part of the pathophysiology of the disease includes the deposition of artheromatous plaques in all of the arteries of the body, including the arteries around the heart. This man has this condition. I know because I treated him. During times of *390 stress or trauma, there is athe pathophysiology that takes place at first is shock which may not be clinically evident altogether but shock always takes place in a minimized degree followed by a temporary hypotension. There may be and as it happened in this case, a bleeding into one of the atheromatous plaques which causes a slow closing off of the coronary artery. This develops, clinically, first at signs of coronary insufficiency which means an insufficient blood supply which means the same as an insufficient supply of oxygen to the heart which causes first a myocardial ischemia, which, if the blood supply is completely excluded the ischemia becomes an infarct which means death of the part. Since I observed this patient and saw him every day * * * there is no doubt whatsoever in my mind that he followed this course, that the mechanism of death was first,the acute cause of death was a myocardial infarct which was due to coronary insufficiency which was due to arteriosclerosis. Contributing cause of death was injury." (Italics ours.)
Thus in Dr. Kety's opinion the acute cause of Clifton's death was a myocardial infarct (i. e., damaging or death of part of the heart muscle), caused by a coronary insufficiency (i. e., decreased flow of blood to heart), which in turn was immediately caused by the shock resulting from the accident or the undue exertion in attempting to work with the painful injuries.
The medical question thus narrows down to whether the accident on the job, with the shock therefrom or from the undue exertion resultant from attempting to work with pain after the injury, caused or contributed or aggravated the coronary insufficiency so as to cause the myocardial infarct which subsequently caused decedent's death.
Dr. Kety reiterated several times that as attending physician he was certain the industrial injuries directly contributed to the myocardial infarct which caused Clifton's death.
Dr. Albert Hyman, a qualified cardiac specialist, testified on behalf of plaintiff most positively that trauma may precipitate the factors leading to death through myocardial infarct of a sixty-two year old man in decedent's position. He testified to his opinion, based on the history as proved by the evidence, that the attending physician's diagnosis of the cause of death was correct. That "the trauma is inextricably connected as a precipitating factor to the end result; that is, death", he felt "sure" was true. (Tr. 256.)
Dr. A. L. Lewis and Dr. J. H. McClendon, general practitioners who (like Dr. Hyman) never saw decedent but testified in reply to hypothetical questions, admitted that an injury with shock, lowering the blood pressure, or exertion might cause the death-causing infarct. But both stated positively in their opinion that the shock in question, not being readily apparent or disabling, was not severe enough to cause the decreased blood flow or coronary insufficiency from which the infarct and death would result.
However, Dr. Hyman, the only cardiac specialist testifying, stated positively that "any form of trauma of any type regardless of the severity, any type of trauma or stress can more or less in ordinary words, be the trigger mechanism which can snowball" into the results herein observed (Tr. 255.) Dr. Kety, the only physician who actually saw and treated decedent during his last illness, testified to his positive opinion that the results of the trauma directly contributed to plaintiff's death, based upon such observation and treatment during the course of the last illness and his prior knowledge of Clifton's pre-existing cardiac condition gained as Clifton's family physician.
In a somewhat similar case allowing an employee compensation when disabled by a cardiac condition, pre-existing but aggravated by a trauma to his head and back or chest, White v. Delta Shipbuilding Company, Inc., 24 So.2d 497, our brothers of the Orleans Court of Appeals (Mr. Justice *391 McCaleb the organ thereof) relied chiefly on the testimony of Dr. Sidney Jacobs, the attending physician who had discovered the heart trouble and administered treatment therefor; it regarded this as preponderating over the testimony of two specialists who examined plaintiff for purposes of litigation, stating, "It must be borne in mind that Dr. Jacobs' testimony is positive that there was causal connection between the traumatic injury and the subsequent heart ailment. This evidence was sufficient to make out a prima facie case for plaintiff and it thereupon devolved upon defendants to rebut it. * * * the evidence of Dr. Jacobs establishes plaintiff's claim with legal certainty unless defendants' evidence can be viewed as preponderating", 24 So.2d 497, 499. See also Olivier v. Daniel Jeffrey & Sons, Inc., La.App. 1 Cir., 169 So. 247.
Decedent had been under treatment by Dr. Kety for "chronic coronary insufficiency * * * due to arteriosclerotic changes" for about four months prior to the accident. Approximately four months before the accident, on diagnosing the coronary insufficiency, Dr. Kety had prescribed digitalis (a heart stimulant) in therapeutic doses; he testified that check by electric cardiogram approximately two weeks after the initiation of the digitalis therapy showed that Clifton was "digitalized", i. e., that the lost heart compensation was corrected, see Webster's New International Dictionary (Unabridged; second edition), Verbo "digitalize."
Because all doctors herein testified that with this condition it is possible for a patient to die of numerous other causes or stresses, or perhaps even without stress and of simple heart failure, defendant-appellant urges strongly that decedent's death herein is not compensable. Defendant overlooks the positive testimony of Dr. Kety, reiterated several times under sharp cross-examination (Tr. 23, 33, 34, 35), that as summarized by the trial court "a man could die of that but that this man did not", Tr. 33-34, but died as a result of the trauma.[1] Defendant further overlooks the well-established jurisprudence that "an injury is compensable where excessive heat, heavy lifting or other strenuous efforts, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a pre-existing condition", Hemphill v. Tremont Lumber Company, 209 La. 885, 25 So.2d 625, at page 627, allowing recovery to dependents of an employee dying as a result of a heart attack.
See also Ozbolt v. Weber-King Mfg. Co., La.App. 1 Cir., 193 So. 383; Brister v. Miller, La.App. 1 Cir., 178 So. 284; Wright v. Louisiana Ice & Utilities Company, 1 Cir., 19 La.App. 173, 138 So. 450, 451; concerning deaths from pre-existing heart conditions. Cf. Henderson v. E. L. Dalton & Co., Inc., La.App. 1 Cir., 47 So.2d 111, concerning death from cerebral hemorrhage, due to industrial strain aggravating preexisting condition.
Cases relied upon by defendant such as Hastings v. Homewood Development Company, La.App., 84 So.2d 883, simply hold that compensation is denied when no causal connection, such as strain or excessive heat or other outside condition, is shown between the employee's work and his resultant heart failure. On the contrary, here the preponderant medical testimony shows that the fall at work, and the results thereof, directly contributed to decedent's death.
The District Court allowed proven medical and funeral expenses and court costs, and further allowed compensation for 300 weeks at the rate of $12.55 per week, being 32½%, the widow's statutory rate, LSA-R.S. 23:1232(1), of "an average weekly wage of $38.62", arrived at by dividing the *392 employee's 1954 earnings by the 33 weeks he worked during 1954. Plaintiff has answered the appeal requesting that the compensation rate be increased to the weekly compensation demanded in the petition of $14.30 per week, based on claimed average weekly wages of $44.
Plaintiff-appellee correctly points out that weekly wages, for purposes of computing the rate of weekly workmen's compensation, are computed based on the rate of daily wages for an 8-hour day, 6-day week, Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22; Gibbs v. Pizzolato, La.App. 1 Cir., 67 So.2d 139, and not by averaging the weekly wages actually earned as was done here. The undisputed evidence is that decedent's hourly wage was $1.01 (Tr. 273); the weekly wages for purposes of computing compensation are thus $48.48, 32½% of which amount exceeds the weekly compensation rate of $14.30 demanded by the petition and answer to the appeal, in excess of which demand of course we cannot allow. The amendment of the compensation rate will be allowed as prayed for.
Plaintiff-appellee further answers the appeal and demands in accordance with the prayer of her petition 12% damages and reasonable attorney's fees for arbitrary failure to pay compensation, under LSA-R.S. 22:658. This is a penalty applicable only to insurers capriciously refusing to pay benefits within sixty days after proof of loss. We are unable to accede to appellee's skillful argument that defendant, who was uninsured, comes under the terms of the penalty provisions specifically applicable only to insurers as aself-insurer.
For the above and foregoing reasons, the weekly compensation rate awarded is increased from $12.55 to $14.30 per week, plus legal interest thereon from date of delinquency until paid; and as thus amended, the judgment of District Court herein is affirmed in all other respects.
Amended, and affirmed as amended.
ELLIS, Judge (dissenting).
The entire basis of the judgment awarded by the District Court is shown in the short reasons for judgment as follows:
"After due consideration of this case and the briefs submitted by counsel, it is this court's opinion that there is a preponderance of the evidence in favor of plaintiff's contention that there was an accident and injury to the husband of plaintiff while in the course and scope of his employment by defendant and that there was a causal connection between this injury and his death, and that, therefore, plaintiff is entitled to 32½% of decedent's weekly wages for 300 weeks."
In my opinion there was a great deal of hearsay testimony that was not admissible as part of the res gestae, and the Lower Court does not separate this testimony nor discuss it.
There are three questions to be decided in this case:
1. Has the plaintiff proven an accident and injury as alleged within the course and scope of the deceased's employment?
2. Was the accident and injury a contributing cause of the death of the deceased as a result of the heart attack on the morning of August 17, 1954?
3. Is plaintiff entitled to penalties and attorney fees where there is no insurer?
In view of the fact that proof of an accident consists of declarations allegedly made by the deceased to members of his family and visitors at his home, it is necessary that we bear in mind that in compensation cases the rules of evidence are to be liberally construed, "* * * but all findings of fact must be based upon competent evidence * * *" and evidence admissible only upon the theory of res gestae must be held within reasonable bounds and should be restricted to declarations clearly spontaneously made at the time of the accident or clearly connected therewith and to statements made shortly thereafter. Statements made *393 by an employee upon his return home from work and shortly thereafter as to the time, place and manner of his injury have been admitted in compensation cases. Day v. Armour Fertilizer Works, 8 La.App. 720; Butler v. Washington Youree Hotel Co., La.App., 160 So. 825; Auzene v. Gulf Public Service Company, La.App., 188 So. 512; Temple v. Martin Veneer Co., La.App., 200 So. 676. (Emphasis added.)
We have other jurisprudence, some most recent, which eliminates hearsay or statements made by a deceased in a compensation case several days after the accident and injury is alleged to have occurred. These cases adhere to the principle that the evidence must be competent.
In Youngblood v. Colfax Motor Co., 12 La.App. 415, 125 So. 883, beginning at page 884, the Court discussed the admissibility of hearsay testimony concerning the evidence of a brother-in-law and brothers of the deceased, as well as some other witnesses. Their testimony was that the deceased told them how the injury was received, but not until several days, and in some instances, a week, after the alleged injury. No evidence was introduced of any person who witnessed the accident. The Court held, citing authorities that the evidence of these witnesses was clearly inadmissible even though the Compensation Act, at that time, contained practically the same provision as to rules of evidence found in the present Act.
Our Supreme Court in Williams v. Jahncke Service, 217 La. 1078, 48 So.2d 93, 95, in dealing with the admissibility of testimony other than hearsay, made the following statement:
"* * * The Court of Appeal endeavors to bolster its position by suggesting that the compensation laws are liberal and that the court should not be bound by the technical rules of evidence. Courts are not authorized to disregard the rules of evidence and rely on evidence that is clearly inadmissible."
In Jack v. International Paper Co., 56 So.2d 875, 877, the Second Circuit, Court of Appeal, stated:
"The testimony of the doctor contains evidence of two conclusions. The first is that Jack suffered an acute lumbosacral strain on each of the two occasions, and secondly, that because of the lumbosacral strain he experienced the two accidents. Courts often rely upon the existence of disability as indicating the occurrence of an accident. It is fitting, however, that such reasoning should be accompanied by an application of the ordinary rules of evidence. At the time Dr. Overdyke examined appellant approximately a year had elapsed. The history as given on that occasion was more or less a narration of past events. Such statements, of course, are not admissible as evidence of the facts stated, but the general rule is that a physician may testify thereto solely for the purpose of disclosing the basis for his opinion. Marler v. Texas & Pacific Railroad Company, 52 La. Ann. 727, 27 So. 176. The Supreme Court in considering the operation of the principles of the res gestae had this to say, in the Marler case, supra, 52 La.App. at page 736, 27 So. at page" 179: `The general rule of evidence is that testimony must be given on oath by persons speaking to matters within their own knowledge, and liable to be tested by cross-examination. (Gillett Indirect Evidence, Section 224).
* * * * * *
"`The admissibility of unsworn declarations in evidence, as part of the res gestae, does not rest upon the theory that there is a great probability that they may be true; for, though these declarations are frequently made under such circumstances as to entitle them to implicit confidence, yet they do not answer the requirements of the law, that testimony against a party shall be given under the test and sanction of a solemn oath, and that he should have had an opportunity of cross-examination.

*394 Waldele v. (New York Central) R. R. Co., 95 N.Y. 274. Were we to permit ourselves to be guided in this matter simply by the high character of the parties making the declarations, and of those testifying to the fact of such declarations, and to the substance of the same, we would test the "admissibility" of evidence by the credibility of witnesses, instead of by fixed rules, determinative not only of that particular, but of all other identical, cases.'
"The Employers' Compensation Liability Act, LSA-R.S. 23:1021-1351, Section 1317 thereof admonishes the courts not to be bound by technical rules of evidence or procedure but findings of fact must be based upon competent evidence. The fundamental principles of evidence as set forth above are still sound and applicable. In cases arising under the act there may be a tendency to liberalize the exception to the hearsay rule relating to res gestae. Day v. Armour Fertilizer Works, 8 La. App. 720; Butler v. Washington-Youree Hotel Company, La.App., 160 So. 825.
"We have considered carefully Dr. Overdyke's testimony for the reason that it is the only medical evidence offered favorable to plaintiff. We are of the opinion that we cannot rely upon it for the purpose of inferring that the injury did occur, especially if we restrict ourselves to the rules of evidence enunciated above."
Under the holding in the Jack case, supra, the statements supposedly made in the case under consideration by the deceased to Dr. Kety three days after the alleged accident and to members of his family and visitors, other than his wife and daughter whom he is supposed to have told upon his arrival home from work that he fell in the mill, were inadmissible as well as statements supposedly made to visitors who viewed the fights on TV with deceased on Wednesday night. Any statement in this dissent as to the inadmissibility of testimony is based upon the authorities above cited.
Proof of an accident in this case on August 9, 1954, as alleged and contended by the plaintiff to have happened to the deceased is entirely dependent upon the statements supposedly made by the deceased upon his return home from work on the late evening of August 9, 1954.
The deceased, Joseph S. Clifton, at the time of his death was 62 years of age, had for many years used crutches to walk as he had lost a foot and part of his left leg prior to the time that he became employed by the defendant. He had worked for the defendant approximately five or six years as a part time sawyer and saw filer. The defendant's brother, Henry Arnold, was also a sawyer and general handy man around defendant's mill and relieved the deceased quite frequently in his capacity as a sawyer. In other words, when the mill was operating and the deceased was filing saws, Henry Arnold would take over the duties of sawyer.
The picture introduced in evidence of this small saw mill reveals the fact that all employees connected with the operation of the mill worked very close together and were in close proximity and plain view of each other. It was shown that the saw filing room was located opposite the saw and across the tracks upon which the carriage moved back and forth in the process of sawing the logs. It is contended by plaintiff that the deceased fell while crossing from the saw to the saw filing room, injuring his leg and back. As stated, proof of this fact is entirely dependent upon the alleged declarations made by the deceased as there was not one witness who was at work in the mill on the day on which the accident was supposed to have happened that saw the deceased fall or had any knowledge of such a fact until some time after his death and then from statements made by the family of the deceased.
The deceased lived some 12 or 13 miles from the defendant's mill and on the whole the evidence reveals that the defendant went out of his way to assist the deceased so that he could continue to work until he reached the age when he could draw a pension. The *395 defendant lived near his mill and on the days that the deceased wished to work he would drive in his automobile 12 or 13 miles and bring the deceased to the mill and in the evening when work was over, he personally drove the deceased back home. As testified to by the defendant, it is shown that the deceased worked when he wanted to, however, it is also shown that he was a good worker and was well liked by the defendant and his fellow employees, and enjoyed extra respect for working under such a handicap.
On August 9, 1954, the defendant went to the home of the deceased and he alleged in his answer and testified that on the way back to the mill to begin the day's work, the deceased told him that "he fell" or that "he fell last week." There is no testimony that the deceased showed that he was in any pain nor did the defendant ask any more about the matter, in other words, no details were given by the deceased and no questions asked by the defendant. He did testify that he presumed that deceased had fallen at home. In other words, he did not pay much attention to this statement by the deceased as the latter was quite a talker and on the way to work in the morning usually talked quite freely about things other than the happenings at the mill.
The deceased completed his day's work on August 9, 1954, and his fellow employees testified that they saw nothing unusual happen that day and he did not fall or suffer any accident that they knew of, and he never complained nor told anyone of having suffered any accident while at work and that they were in such close proximity to the spot where he is supposed to have fallen in crossing the carriage tracks that they would have known or seen it had it happened. The defendant testified that he returned the deceased to his home after work hours and that he said nothing to him on the trip about having fallen. However, we then have the testimony of the wife of deceased, plaintiff herein, who stated that when plaintiff came home after work on August 9, 1954:
"Q. Will you start your answer over again? A. He told me he was suffering from his back awful, that he had had a fall. I asked him how he fell and he said he was crossing over going to the filing room and he fell. And I asked him if anyone knew that he fell and he said `Yes, Mr. Henry Arnold and one of the other employees came to help him up.' He said Henry had picked his crutches up, he said one crutch had went way out ahead of him and he had picked it up and brought it to him and they helped him up. Now, who that other employee was I don't know, he didn't never tell me the name."
She testified that the deceased's left leg and back were injured and that there were dark bruises on the inside of his leg up about the middle thigh, and the bruise was almost the length of his leg from the knee up, and a dark bruise in the small of his back. She observed these bruises when she bathed him with liniment and alcohol. She knew nothing of his taking digitalis for his heart condition for the four months prior to his death.
Mrs. Laura Boyle, daughter of the deceased, testified that she was at home on the night of August 9 when her father returned from work and complained "with his back and leg, he said he had fallen at work," and she helped her mother rub him down. She saw an ordinary bruise across the small of his back, and another on the inside of his leg. She stated these bruises were fresh as you could still see "red around the sides." On the day of the funeral, this witness had occasion to meet and talk to the defendant, whom she stated told her that her father had fallen but that he did not say "when he had fallen."
Also testifying was Mrs. Nellie Stanga, a daughter of the deceased, who stated that her father told her "on Thursday after he fell on Monday" that "he had fell on the way to the filing room." This testimony should not have been admitted under the general objection made by counsel for defendant as too long a time had elapsed between the alleged accident and the statement by the deceased. It could not be considered a part of the res gestae.
*396 George W. Clifton, son of the deceased, stated that he saw his father on the night of August 9, 1954 and "saw where he was bruised on the leg and side of the stomach," and it was on this occasion that his father "told me he fell going from the saw to the filing room, by the carriage." This witness was allowed to testify to conversation had with the defendant at the "wake" prior to his father's funeral over the objection of counsel for defendant. He stated that the defendant "told me that my father had fell and that Henry had told him about it but he didn't think he was hurt that bad." This witness identified the injured leg as the right and then stated that he could not be sure, it was one of his legs, and on the edge of his stomach. His father had no other bruises to his back or other leg. He did state, however, that his father was complaining of pain "with his back around the belt line."
The next witness offered by the plaintiff was Walter Clifton, a brother of the deceased, who testified as to what the deceased told him on the night of August 9, 1954:
"A. Well, he told me that he fell out at the mill and had hurt his back real bad and that his back was hurting him very bad and he was gonna go back out to work the next day and so then he told me that he went out and I saw him every evening and he come in on Tuesday and he just couldn't hardly make it, his back was murdering him so bad."
I do not believe this testimony is admissible as part of the res gestae, in fact, it would appear to me that the parties who saw him immediately upon his return from work, the plaintiff and her daughter, would be the only ones whose testimony could be considered by giving it a most liberal interpretation as being a part of the res gestae. The statement of this witness clearly shows that he was testifying as to what the deceased brother told him later than Monday night. Of course, I take it that the lower court considered all of this testimony in arriving at the judgment herein. This witness also stated that his deceased brother told him that "he told Mr. Sam coming in that he had fell at the mill that evening." This is the first witness who stated that the deceased told him when he fell, viz., in the evening. In addition to the members of the family who testified as has been detailed above, plaintiff offered as a witness, Mr. and Mrs. Andrew Goldate, who testified over objection of counsel for defendant that they went to the home of the deceased on the night of August 11, two days subsequent to the alleged accident and which was on Wednesday night, to look at the fights on television, and the deceased told the husband "his back was hurting him awful," and "he fell he said at the mill." When pressed for the exact words of the deceased he testified:
"A. He saidhe was sitting down and he turned around and said `Oh Lord, it liked to got the old man.' I always called him Mr. Cliff, and I said, `What happened, Mr. Cliff?' He said `I fell at the mill.'"
He told this witness nothing more than quoted about the details of the accident and the witness asked him nothing more. Mrs. Goldate testified that when she came in and spoke to the deceased, "he told me that he had fallen at the mill and hurt his back" on Monday, "the 9th" and that her husband should have heard the same thing as they were both present. According to the testimony of Goldate and his wife, the deceased was up and around the house on Wednesday night.
Dr. Kety, the family physician, testified that he had known the deceased and had visited his home for about four years prior to his death and for approximately four months before death, "because of development of symptoms compatible with heart failure" he "digitalized" him. On Thursday morning, August 12, he saw the deceased who complained at that time of his back hurting him and he found him to be suffering from a lumbo-sacral strain, "what people call a wrenched back." He also found a large bruise approximately four by three inches on the inner aspect of the left thigh and a large abrasion and hematoma bruise on the left flank. He also complained "of pain in the left chest." Evidently later *397 that evening or night or Friday (the testimony is not specific as to time), he had his partner Dr. Mulligan see him "with me and we put his leg in traction on the side where the spasm of the muscle was in the back." While this doctor was not asked how long he kept the deceased in traction, he never testified that it was ever taken off, which would leave the impression that it remained on the deceased up until the time of his death, and this was evidently the impression which counsel for plaintiff got as shown by hypothetical question put to Dr. Lewis, witness for the defendant. However, the wife of the deceased and plaintiff herein testified that she could not be sure that the traction was removed on Saturday. According to her testimony it could have been removed Saturday morning or earlier, but it is clear that he was not in traction on Sunday as he talked on the telephone to the defendant. Dr. Kety stated that the deceased's progress was satisfactory except that he complained of intermittent "pressure in his chest" but he had so many pains that he thought it was due to the fall. He did check his cardiac status and testified that at that time he was not in heart failure and he therefore treated him with bed rest. He saw the deceased twice a day on the 12, 13, 14 and 15 and again on the morning of the 16th. He went to New Orleans on the night of the 16th and when he returned about 1 A.M. on the 17th, Dr. Mulligan, his associate, had left a note for him to call him, which he did, and he was told that the deceased evidently had had a cardiac attack. Dr. Kety was called early in the morning, about 5:30 A.M., and went to the home of the deceased where he found him "having a massive coronary eclusion". He remained at the home about two hours, returned to his office and about 11 o'clock was called back and when he arrived at the home he found him dead.
Over the objection of counsel for defendant, Dr. Kety was allowed to testify that the deceased told him that he fell on a carriage track at work. This testimony was inadmissible and should have been excluded. It was not even necessary for a diagnosis as Dr. Kety testified he found bruises on the deceased and he also complained of pain and he diagnosed his trouble as a lumbo-sacral strain. It is to be remembered that the deceased made this statement to the doctor on August 12, three days subsequent to the alleged accident, which is entirely too long afterwards to be considered as competent evidence, even in a compensation suit to prove the accident.
The above and foregoing constitutes all of the testimony offered on behalf of the plaintiff to prove the accident. Nowhere in any of these witnesses' testimony do they give any details of the accident, showing that the deceased evidently gave them no details and further that they asked for no details. This to my mind is strange as it would appear that either the deceased normally and naturally would have given details or would have gone into details in telling of the accident, and if not, that they would have questioned the deceased to find out the time and exactly how and where he fell.
There was one other witness whose testimony touches upon the possibility of where and how the accident occurred and which is not contingent upon what the deceased told him. This witness was John Clifton, a brother of the deceased, whose testimony is not very satisfactory. He stated that he went to the mill on August 3, 1954, to see about a job and he saw his brother across the carriage track from the filing room "to go across the carriage track to go to the saw arbor and file a saw." He stated that he helped his brother place a board across the carriage track and that this was necessary so that he could go to the rear of the saw and also to avoid a hole in the middle of the tracks to the left of the saw through which sawdust and debris fell and was then conveyed by a moving chain out of the mill. This hole was referred to as a "saw arbor." This witness testified that the carriage rail was on a six by eight (shown to be a three by eight) and underneath this was "a cross tie foundation to hold it level." The foundation is shown by the testimony without any question to be of concrete. He positively stated that the foundation was not concrete and when questioned as to why he *398 remembered August 3 as being the day that he was with his brother at the saw mill, answered: "Well, the way I remember the perfect day, my brother's wife was telling me not too long after he was dead that she reckoned she was going to have to sue Mr. Arnold." It is this witness' testimony that his brother had a board which he used to cross this carriage track. The testimony of the witness, in my opinion, is not to be given any value. He would have us believe that this one-legged man who had to walk with two crutches would place a board from one carriage rail to the other in order to cross. The rail was about an inch and a half high and rested on a sill which was three inches above the concrete, or a total of about four and a half inches above the concrete foundation of the track. When Joseph Clifton would get up on the board his crutches would lack four and one half inches of reaching the foundation which, of course, would necessitate a most awkward position in order for him to cross. Furthermore, there is no reason why he did not know that the foundation was on concrete. Any sawdust would have been between the rails whereas it is shown that the solid concrete foundation was plainly visible on the sides. In addition, the deceased never made any statement, admissible or inadmissible, that he was walking a board when he fell. As a matter of fact, the very brevity of the declarations testified as having been made by the deceased clearly weaken plaintiff's case. Furthermore, his fellow employees who testified in this case never saw him use a board to cross the track and from a description of the foundation and track it would have been much simpler and less dangerous for the deceased to have crossed without trying to walk a board.
On behalf of the defendant we have the testimony of his brother, Henry Arnold, which has been somewhat discussed briefly. However, it is sufficient to say that had the deceased fallen in the mill on August 9 as contended it is difficult to understand how it would have escaped the attention and knowledge of this witness.
Percy Grogoire, who had been working at this saw mill approximately eight years and knew the deceased the entire time he was working at the mill, stated that he operated the cut off saw which would be located about 20 feet from where the deceased worked, and that he could see him at all times, and that he never saw him fall and knew of no occasion when he fell or got injured. He was at work the last three days which the deceased worked, Monday, Tuesday, and Wednesday. He never saw the deceased while working there place a board across the carriage rails and stated that there was no necessity for doing such a thing. It was his positive testimony that from the position he was working in, if deceased had fallen between the carriage rails on the way from the saw to the filing room or vice versa, he would have seen him. Under cross examination he explained that while working he was looking in the direction of the deceased as he was pushing lumber down a chain.
Badon, another fellow employee of the deceased, stated that he worked the week of August 9 and never saw the deceased fall; that if he had he was right there and would have seen him, and he never saw any board across the rail, and that the deceased had never complained and had never stated that he fell. On cross examination this witness was asked if, on the last day which deceased worked at the mill, which was Wednesday, August 11, he noticed him bending over and apparently in pain, and he stated, "No sir, he seemed to be very jolly to me that day." This witness in testifying about the times Mr. Clifton was off was asked and testified as follows:
"Q. When was this, when did he say he was sick once? A. Oh, that was way before he
"Q. Before he fell? A. Yes, sir, but I don't knowyou see, I didn't keep no record of that, I just know what Mr. Clifton tells me, you understand.
"Q. Yes, the time he got off sick was away before he had this fall that he hurt himself? A. Yes, sir, he didn't stay home but a few days.
"Q. And other than this one instance that he stayed off for being sick *399 he generally worked the same number of hours you worked, you would be there with him? A. Yes, sir, he worked pretty much the same."
This is the only testimony by this witness of any fellow employee that even intimated that the deceased fell, and a fair interpretation, considering all of his testimony, would be that he was not testifying to that fact. It is shown that he was interrupted by counsel and, more important, other than his quoted testimony he was not asked another question by counsel with regard to this admission. In fact, the balance of his testimony under cross examination was to the effect that he saw the deceased every morning when he came to work and the latter would greet him with "Good morning, Buddy, how are you this morning." He watched him walk to and from the saw and denied that the deceased could have fallen without him seeing him for the reason "I would be so close to him that if he would have fell it would have called my attention." The only place that this witness stated he couldn't see the deceased was a portion of the inside of the filing room, however, there is no contention made that he fell inside the filing room, only when he crossed the carriage track. This witness stated that he did not know anything about the deceased having hurt himself until after his death when the defendant came and asked him had he seen him fall. This witness turned the logs that the deceased sawed into lumber and was therefore in very close proximity to the deceased at all times that the mill was in operation.
Also testifying on behalf of the defendant was his son, Dewitt Lee Arnold, who was the time keeper and who stated that if the deceased had sustained the fall as contended he would have known about it. It is also shown by this witness that it is not necessary for a person to go from the sawyer's stand to the filing room and have to pass over any excavation, pit or hole. In other words, it was not necessary for the deceased to cross the "saw arbor" or hole through which the sawdust and debris fell and was sawdust and debris fell and was carried out of the mill. The deceased never told him of having been injured on August 9 or any other date while in the employ of the defendant.
Thus we have the plaintiff relying upon the declarations of her deceased husband which are inadmissible except those allegedly made to her and her daughter when the deceased returned from work on the evening of August 9, 1954. The strongest testimony corroborative of plaintiff's contention is that of the defendant himself to the effect that the deceased told him while he was conveying him to work on the morning of Monday, August 9, 1954, that "he fell" or that "he fell last week." In addition, there is testimony that the deceased had a bruise on the inside of either the left or right leg, the right side of his stomach or the middle of his back. The testimony is somewhat in conflict as to the location of the alleged bruises. Dr. Kety, who apparently took a personal interest in this case, also testified as to the bruises. Again it appears strange, though, that none of the witnesses got a detailed account, either voluntarily or by questioning the deceased, as to exactly where he fell, when he fell and why he fell. Can we say from this testimony alone that it is proven that the deceased fell and injured himself as contended at the defendant's mill? It might be argued that the defendant had an interest in this case. On the other hand it is equally true that the plaintiff and her witnesses, with the exception of Mr. and Mrs. Goldate, also had a great interest at stake. Furthermore, why did the defendant, if he intended to deliberately lie, have not denied that the deceased told him anything? Also in arriving at a decision it must be remembered that the deceased worked all day Monday, all day Tuesday, and all day Wednesday, without complaint or mention of any injury suffered as the result of a fall. The defendant also stated that on Thursday morning, August 12, the deceased called him and told him "I ain't coming out this morning, I don't feel good." There is not even a hint in defendant's testimony that the deceased mentioned any injury or the result of any fall as a reason for his not coming back to work on Thursday, August 12. Furthermore, while the defendant testified that the deceased also called him on Sunday *400 night August 15 to tell him he was not coming to work on Monday and it would probably be Tuesday, there was no mention made that he was suffering as the result of any fall or any injury. The plaintiff states that she talked to the defendant rather than her husband and there is no testimony by her that she mentioned the reason for her husband's absence from work.
The defendant has offered disinterested witnesses whose positions while employed in the mill afforded them every opportunity of seeing their fellow employees while the mill was in operation. These witnesses were positive in their denial that the deceased had fallen as alleged or that he had ever told any of them that he had fallen. It would be logical to assume that if he was as badly hurt and had suffered such a severe strain and was in such great pain subsequent to the accident that on Tuesday and Wednesday his fellow employees would have been aware of it. There is an absence of testimony on behalf of the plaintiff that the deceased was confined to his bed on Tuesday and Wednesday nights, in fact the evidence is to the contrary. The deceased was up and able to phone on the morning of August 12, was up in his home and looked at the fights on TV on Wednesday night, August 11, and was taken out of traction (if ever put in) at least on Saturday, August 14, and on the night of the 15th, according to the defendant, personally phoned and talked to him. It is possible that the deceased on Thursday morning, August 12, was suffering more from his chronic heart condition than anything else, for Dr. Kety testified he had pains in his chest and repeatedly complained of pressure in his chest.
I am of the opinion that the plaintiff has failed to prove an accident as alleged within the course and scope of the employment of the deceased.
We have the testimony of Dr. Kety which in my opinion is clearly not shown to be disinterested. It is clear even from his testimony that the deceased died as a result of an acute coronary insufficiency, which developed into a myocardial infarct, in laymen's language, of a heart attack.
The question is whether the alleged traumatic lumbo-sacral strain allegedly suffered as a result of the accident of August 9, 1954, when the deceased is supposed to have fallen at defendant's mill was the proximate cause of the cardiac condition resulting in death.
The opinion of Dr. Kety was positively in the affirmative, although he admitted that the deceased had been suffering from the kind of heart trouble that finally caused his death for at least four months prior thereto, and that he had been treating him specifically for this trouble. Dr. Kety admitted that the deceased could have died of this heart condition without the alleged accident and resulting injury. He gave as the basis of his opinion the following answer:
"My opinion is that in this individual there was a normal amount of arteriosclerosis present. Arteriosclerosis is a generalized disease. Part of the pathophysiology of the disease includes the deposition of atheromatous plaques in all of the arteries of the body, including the arteries around the heart. This man has this condition. I know because I treated him. During times of stress or trauma, there is athe pathophysiology that takes place at first is shock which may not be clinically evident altogether but shock always takes place in a minimized degree followed by a temporary hypotension. There may be and as it happened in this case, a bleeding into one of the atheromatous plaques which causes a slow closing off of the coronary artery. This developes, clinically, first at signs of coronary insufficiency which means an insufficient blood supply which means the same as an insufficient supply of oxygen to the heart which causes first a myocardial ischemia, which, if the blood supply is completely ecluded the ischemia becomes an infarct which means death of the part. Since I observed this patient and saw him every day there is no doubt whatsoever in my mind that he followed this course, that the mechanism of death was first,the acute cause of death was a myocardial infarct *401 which was due to coronary insufficiency which was due to arteriosclerosis. Contributing cause of death was injury."
It is to be noted that in the above answer Dr. Kety states that during times of stress or trauma, in this case, the latter, the pathophysiology that takes place at first is shock, followed by a temporary hypotension. Dr. Kety wrote a letter to the plaintiff clearly for the purpose of a lawsuit setting forth the cause of death and stating that the accident and trauma contributed thereto. This letter was admitted, although objected to. I do not think it was admissible; however, it gives no information which the doctor did not testify to with much greater emphasis. It is shown that Dr. Kety discussed the cause with all the other doctors who testified and told them of the heart organizations that he belonged to and in general took an extraordinary amount of interest in the plaintiff's case. The letter which he wrote the plaintiff was dated September 3, 1954, and when counsel for defendant intimated that it was written as an afterthought he stated that he had written up the death certificate immediately after death and it was filed with the Board of Health; however, no such certificate or certified copy was offered.
It is also shown by the record that it was about the time of the writing of the letter or just prior thereto and possibly not closer than ten days after the death of the decedent that the family inquired about insurance from the defendant. This was the first time that the defendant knew or suspected that a claim for compensation might be forthcoming. It is shown that Mrs. Laura Boyle, plaintiff's daughter, called the defendant with regard to compensation or claim for compensation slightly before or about the time that Dr. Kety wrote his letter to the plaintiff. Defendant testified that during this conversation she asked him if he had any insurance to which he stated "no" and she stated that she had called on account of "Mama, she wanted to report it to the insurance company." Defendant stated that he told her: "`This is the thing here, I talked to you all down there that night and I offered you my help and everything and you all said it was nothing we could do that Mr. Clifton died with heart trouble.' And I said Dr. Kety didn't call me or send me word or nothing else and it really did astonish me."
Dr. Lewis and Dr. McClendon, both experienced general practitioners, were positive in their opinion that if the deceased suffered the accident as stated on August 9, 1954, continued to work that day and the following two days, was seen by the doctor on the morning of August 12 "with lumbosacral strain and pains in his chest, placed in traction and died on Thursday, August 17, 1954, that the accident and injury of August 9th was not a contributing factor to the heart attack and resulting death." It was their opinion that unless the accident caused disabling shock that the heart attack suffered a week later could not be attributed to the accident. Dr. Kety and these two doctors apparently only differ in the degree of shock which must have been evidenced in order to attribute the heart attack seven days later to the accident. The plaintiff offered the testimony of Dr. Albert L. Hyman, an expert in heart disease, who was then teaching in the field of cardiology and who was engaged in practice half of a day. I presume he means that he taught half a day and practiced half of each day. He testified that the diagnosis of Dr. Kety was likely to be correct. With regard to the opinion of the two general practitioners, Dr. Hyman testified:
"Q. Now, the opinion of the second doctor, of the other two doctors who oppose the conclusions of the attending physician, that trauma that does not produce disabling shock cannot cause coronary failure, is that statement correct or incorrect? A. I think I touched on that in the first question but I would say that any form of trauma of any type regardless of the severity, any type of trauma or stress can more or less in ordinary words, be the trigger mechanism which can snowball greater and greater, greater stress, greater trauma, as has apparently happened in this man, he didn't feel that he was so sick that he had to go in the hospital and then it keeps going on and on until *402 it does. I would have to disagree that shock has to bethat the man has to have shock which, of course, must be disablingthere's no such thing in medical terms as shock that is not disabling. Shock is not necessary for the production of this series of events as you explained them to me.
"Q. Now, I have one last question to put to you, Dr. Hyman, and that is the second hypothetical question with several facts added. The patient is sixty two years of age, has been suffering from arteriosclerosis for four months immediately prior to trauma, has been digitalized by his attending physician, falls and sustains bruising injuries to his leg and back of which he complains at the time of the fall, but continued to work as a sawyer in a sawmill for two days after sustaining his injuries, is then put to bed and in order to relieve spasms of his back attending physician places leg in traction and in addition to pain in back patient has gripping chest pains and five days later dies. Attending physician diagnosed his death as coronary insufficiency, myocardial infarct with statement that the lumbo-sacral strain was directly involved in the coronary failure. With these new facts in the hypothet, is the attending physician correct in his final diagnosis? A. I would not disagree with the final diagnosisif you want me to amplifyI will.
"Q. Please amplify why you agree. A. The way I feel is thiswe see this syndrome so frequently of a man who has had heart disease previously who develops some sort of injury, the added stress of that injury particularlyapparently, if he gets worse and worse, goes in the hospital and has traction, these other factors that I mention come into play, add greater stress to the heart, increase the work of the heart, produce relative ischema or decrease blood flow to the heart which is a matter of pathology which should be straightened out, but these things precipitate frequently myocardial infarction. Now, even if it were the other diagnosis that I would possibly entertain, the same mechanism applies, it doesn't make any difference.
"Q. You are speaking now of pulmonary embolism? A. Pulmonary embolism, yes.
"Q. In other words, in either event the other possible diagnosis you refer to would be pulmonary embolism?
A. Yes.
"Q. And, as I understand what you say, that in either event the trauma is inextricably connected as a precipitating factor to the end results; that is, death? A. I feel sure that's true."
Under cross examination he testified as follows:
"A. I don't make the claim that I believe that the injury caused the infarction. I say it set off a series of events that could have caused it. (Emphasis added.)
"Q. And by the same token other events could have caused the infarction such as over exercise, over indulgence, over eating, over drinkingA. I hardly believe that a man in traction would do very much exercise, of course, emotional trauma of a man this gentleman describes being put up in traction. Undoubtedly, that will weigh heavily on the stress phenomena."
At best the expert's testimony is that the injury could have caused the heart failure in that it might have set off a series of events that could have caused it. In fact, from his testimony he clearly states that he did not make the claim that he believes that the injury caused the heart attack. Dr. Hyman, according to his testimony, above quoted, in order that the accident might be a contributing cause of the heart attack and death of the deceased, placed a great deal of stress upon the fact that the deceased had a heart disease previously, and developed some sort of an injury and therefore had an added stress as a result of that injury, and apparently gets worse and worse, "goes in *403 the hospital and has traction", resulting in an added greater stress to the heart, increases the work of the heart and decreases the blood flow to the heart. The factual basis of this opinion cannot be applied to the deceased for if he received an injury at the mill it occurred on August 9 and he worked, as previously stated many times, three days and it was not until Thursday that he saw Dr. Kety and Dr. Mulligan and was placed in traction, and the traction removed not later than Saturday. He did not go to the hospital and there is nothing in the record to show that he grew "worse and worse", as a matter of fact, he was up and around the house at least during the time that he was not in traction. All in all, Dr. Hyman's testimony, while he states that he agrees with the diagnosis made by Dr. Kety as to the cause of death, an examination of his entire testimony merely shows that he believed the injury under certain facts and conditions which do not exist in this case could have been a contributing factor to the heart attack and death of the deceased. Dr. Hyman testified that Dr. Kety called him apparently to discuss the case prior to his testimony and that he told him he thought it would be better if they did not discuss it. In other words, this record in my opinion shows a great deal of interest by Dr. Kety and for that reason I do not place much credence in his testimony. He was most positive in his diagnosis that the injury suffered by the deceased as a result of the accident was a contributing or proximate cause of the heart attack and death, whereas he, as well as two other doctors, had to admit that with such a heart condition the deceased might have died at any time as a result of ordinary exertion or while in bed, and without any accident or injury.
I am of the opinion that the plaintiff has failed to prove that the injury which the deceased suffered (if any) was a contributing cause of his death.
While I have no quarrel with the authorities cited in the majority opinion that competent evidence is that which is relevant and material and relevant to the issue to be determined, etc., it is equally true that in addition such evidence to be competent must be admissible, and purely hearsay evidence is not admissible under any rule of evidence and it is, therefore, not competent. The alleged statements of the deceased in this case, if admissible, must be so under the res gestae rule of evidence, and statements made at a time too remote, from one to six days, subsequent to the accident cannot be admitted under the theory of res gestae.
The complete basis of the majority opinion's holding as to proof of the accident is contained in the following statement: "* * *we feel that the accident at work in this suit is preponderantly proved by the testimony accepted as credible by the District Court of decedent's wife and daughter as to decedent's bruises and explanation therefor after his return from work on August 9, 1954, said bruises being corroborated by the physical examination of a physician on August 12th."
I cannot agree that such testimony is credible for the following reasons:
According to the testimony of the mother and daughter, the deceased was badly bruised and suffering to such an extent that he went to bed and was rubbed and treated by his wife. The alleged statements of the deceased admitted in evidence to other parties, to the effect that "It liked to got the old man" and that it was necessary to place him in traction are hardly credible and highly inconsistent with the fact that there is not one line of testimony in this record that on Tuesday morning the deceased made any complaint of pain nor that anyone had to assist him down his steps which were approximately four feet high, nor, as a matter of fact, that when he returned home the evening before or the day of the accident anyone had to assist him out of the automobile and up these steps. There is no testimony that the wife and daughter of the deceased went to the defendant Arnold's car with the supposedly bruised and suffering employee or protested his going to work the next morning. The deceased worked all day Tuesday without a complaint to Arnold or any employee in the mill or without mentioning any accident or any bruises, and if *404 he was bruised so badly and was in such pain that he had to be placed in traction on Thursday morning following the accident on Monday, it is only reasonable to believe that he was suffering more on Tuesday than he was on Thursday, yet not one of the employees in the mill could tell anything was wrong with him and he made no further complaint whatever to Arnold, the defendant. Furthermore, Arnold brought him home on Tuesday evening and there is no testimony that after riding the 12 or 13 miles from the mill that he needed any assistance in getting out of the car and up his steps, nor any testimony that he showed any evidence of any disability or pain in walking from the car up into the house. Not one member of his family mentions any statement or action or appearance of injury and pain other than "I fell at the mill and hurt myself," and they treated him at night for the bruises. It is rather strange, to say the least, if he was injured as badly as Dr. Kety and the members of his family would have one to believe that he did not show it by his actions or his movements rather than only supposedly by word of mouth.
On Wednesday morning what do we find but the deceased apparently getting up as if he had never had an accidentthere is no testimony to the contrarydressing himself, presumably getting his breakfast, going out of the house, getting into Mr. Arnold's carno apparent or visible pain, no complaint, no protest by any member of the family, drives 12 or 13 miles to the mill without mentioning any accident or any pain or that anything in the world is wrong with him, works all day, comes home in the evening in Mr. Arnold's car, gets out of the car as usual, again no testimony that he showed in any manner whatever by his manner of walking or otherwise that he was suffering.
On Thursday morning the deceased phoned the defendant not to come after him to go to work, that he wasn't feeling well there being no testimony by any member of the family that this was not the gist of the conversation. In other words, here was another opportunity where the deceased could have told the defendant of his accident and his pain as a result thereof and that for that reason he would be unable to go to work but he did not do so. He was seen by Dr. Kety, either as the result of one of the doctor's social visits which he testified he made, or as the result of his having been called, and Dr. Kety then testifies of the bruises on the deceased and that he was in so much pain that it was necessary to place him in traction.
It is difficult for me to believe that if the deceased was bruised and suffering on Thursday so that it was necessary to place him in traction that it was the result of an accident which happened on Monday. Furthermore, the two visitors who came to look at the fights on TV on Wednesday night testified only as to what the deceased is supposed to have told them but there is no testimony as to anything unusual about the way he walked nor any apparent sign of pain.
On Friday or Saturday the traction was removed according to the wife of the deceased, and except for this short time the deceased was up and around and he talked on the telephone to the defendant Arnold on Sunday to notify him not to come for him to go to work on Monday, and again there is no testimony that during this conversation he ever mentioned as a reason for his staying at home any accident or injury at the mill on the previous Monday. Not one member of his family during the entire time from Monday, when the deceased is supposed to have told them he fell and was injured that day, said one word to the defendant Arnold, even though he came to their house twice on Tuesday and twice on Wednesday, about the alleged accident and injury to the deceased, nor during this entire time until he died did any member of the family phone the defendant with regard to any accident or injury.
The first time any member of the family made any claim of any accident and injury to the defendant or anyone else by any credible testimony was after Dr. Kety wrote the self-serving letter of September 3, 1954, in which he stated in effect that the deceased *405 had died from a heart attack caused by trauma or injury as a result of the accident.
Dr. Kety's extraordinary interest as shown by this record, in my opinion, affects the credibility of his testimony. Plaintiff's testimony, when analyzed, is not sufficient upon which to base a judgment against the defendant. There is nothing in the reasons for judgment of the District Court which shows that the manner or demeanor of the defendant in giving his testimony led her to disregard his testimony. The same may be said of the other witnesses for the defendant.
On the other hand, it appears to me that the testimony of the defendant and his witnesses is reasonable when viewed in the light of the actions of the deceased. While it is true that it was possible for the deceased to have fallen and these other employees in the mill not to have seen him, it was not probable, and the testimony should be judged on the latter rather than the former.
The lengthiness of this dissenting opinion is due only to the fact that this case was originally assigned to me and I can think of no good reason why the detailed report which I first made should not be used.
For the above reasons, I am of the unalterable opinion that the judgment of the District Court and the majority opinion of this Court is erroneous and I respectfully dissent.
Rehearing denied; ELLIS, J., dissenting.
NOTES
[1] A fair sample of this line of cross examination is the following, Tr. 34:

"Q. Dr. Kety, do you recall talking to me and didn't you tell me that Mr. Clifton could have died from a strain of some kind, or he could have died from some exertion in his own bath room or some exertion in his own home or even sitting in a chair? A. The answer is yes but that is only half of what I told you. He could have but he did not, he died from a myocardial infarct due to coronary insufficiency due to trauma."